**In re GRAND JURY PROCEEDINGS**
**Cecil MILLS.**

**Appeal of UNITED STATES of America.**

**In re GRAND JURY PROCEEDINGS**
**Cecil MILLS.**

**Appeal of Cecil MILLS.**

**Nos. 81–2703, 81–2808.**

United States Court of Appeals,
Third Circuit.

Argued April 1, 1982.

Decided July 28, 1982.

Certiorari Denied Nov. 15, 1982.

See 103 S.Ct. 386.

Joseph J. Farnan, Jr., U. S. Atty., Edmund D. Lyons, Jr., Asst. U. S. Atty. (argued), Wilmington, Del., for appellant/cross-appellee U. S.

David B. Stratton, Helen L. Winslow (argued), Richards, Layton & Finger, Wilmington, Del., for appellee/cross-appellant Cecil Mills.

Before GIBBONS, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

On August 14, 1981, pursuant to a writ of habeas corpus ad testificandum, appellee/cross-appellant Cecil Mills appeared before a federal grand jury for the District of Delaware. The grand jury was investigating the December 17, 1980 armed robbery of a Wilmington, Delaware, bank by at least two men,[1] one of whom wore a dark blue ski mask which was recovered from the scene of the robbery by the police shortly after the crime was completed. Mills was and is suspected of being the masked robber.[2] The grand jury directed Mills to (1) furnish samples of his scalp and facial hair for the purpose of comparison with hairs found entwined in the abandoned ski mask, and (2) permit agents of the grand jury to accurately measure his height and weight for comparison with eyewitness descriptions and bank camera recordings of the robbery. Mills refused to assent to the grand jury's demands. The government immediately petitioned the district court for an order directing Mills to comply, which

1. The government believes that a third participant, who did not enter the bank during the robbery, may have driven the get away car. The undisguised robber who entered the bank was subsequently apprehended and convicted of violating 18 U.S.C. § 2113(a) and (b) for his role in the armed robbery. App. at 4a.

2. Although the government states that Mills is suspected, no basis for the grand jury's suspicion has been offered, other than the district court's speculation that Mills' height and weight approximate that of the masked robber described by eyewitnesses. App. at 32a.

petition was granted that day, August 14, 1981.[3] Mills then requested and was afforded the opportunity to consult with an attorney. On August 20 Mills informed the government that despite the court order he continued to refuse to comply with the grand jury's request, unless he was first served with a valid search warrant. The government declined to seek such a warrant, and Mills subsequently moved the district court to vacate or modify its enforcement order.

On September 11, 1981 the district court, 522 F.Supp. 500, issued an opinion and order vacating its previous direction that Mills submit to the sampling of his head and facial hair. The court, however, reiterated that portion of its earlier order compelling Mills to allow the measurement of his height and weight. Relying upon *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), and *In re Melvin*, 550 F.2d 674 (1st Cir. 1977), the district court reasoned that grand jury compelled measurements of height and weight, like the compelled production of handwriting and voice exemplars or participation in a lineup, do not fall within the protective embrace of the Fourth Amendment since voice, handwriting, and appearance are characteristics held out to the public with respect to which individuals enjoy no expectation of privacy. The court distinguished the compelled production of head and facial hair, comparing that portion of the grand jury's demand to the police seizure of a blood sample in *Schmerber v.*

3. In addition to limiting the uses to which the samples and measurements were to be put, the initial district court order provided that:

Both the taking of hair samples and the measurement of Mr. Mills' height and weight shall be accomplished under the supervision of a duly authorized agent of the Grand Jury and shall actually be effected by a doctor or other trained medical personnel.

App. at 7a.

*California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The court cited *United States v. Allen,* 337 F.Supp. 1041 (E.D.Pa. 1972), which held that blood, hair and other "body components," absent exigent circumstances, can be seized only through the warrant process and upon probable cause. The district court found that there was no suggestion of probable cause sufficient to support a warrant. App. at 31a.

The government appeals pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291 from the district court's refusal to enforce the grand jury's demand for hair samples. *See In re Grand Jury Empanelled February 14, 1978,* 597 F.2d 851, 854–58 (3d Cir. 1979). We reverse and order that the district court reinstate its earlier order of August 14, 1981. With regard to Mills' cross-appeal, the district court's order compelling the measurement of his height and weight is not a "final order" appealable under 28 U.S.C. § 1291, and therefore is not properly before this court for review.

### II.

The threshold issue is whether a demand by a grand jury that a witness submit to hair sampling is a search or seizure protected by the Fourth Amendment. We begin with the ruling established in *Dionisio* that a grand jury's subpoena to appear is not a "seizure" of the individual within the context of the Fourth Amendment, stating "It is clear that a subpoena to appear before a grand jury is not a 'seizure' in the Fourth Amendment sense, even though that summons may be inconvenient or burdensome." 410 U.S. at 9, 93 S.Ct. at 769. The Court distinguished the situation before it, where the grand jury had summoned by subpoena approximately 20 people to give voice exemplars, from the "lawless dragnet detention" of 24 individuals by the police for fingerprinting in *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969): "*Davis* is plainly inapposite to [*Dionisio*] where the initial restraint does not itself infringe the Fourth Amendment." *Id.* 410 U.S. at 11, 93 S.Ct. at 770. Mills argued that the district court should vacate

or modify the original enforcement order because of "the disquieting possibility that the United States may be operating a simple dragnet aimed at every black male of appropriate physical stature in the Wilmington area to obtain hair samples and weight and height information." App. at 16a. The assertion that such a "grand jury dragnet" would be prohibited by the Fourth Amendment cannot survive the Supreme Court's conclusion in *Dionisio.*

The conclusion that a grand jury summons is not a seizure for purposes of the Fourth Amendment is not dispositive of whether a subsequent demand, in this case for hair samples and height and weight measurements, may be a search or seizure falling within Fourth Amendment protection. As the Court stated in *Dionisio,* 410 U.S. at 8, 93 S.Ct. at 769, "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents . . . and the subsequent search for and seizure of the evidence." In *Davis v. Mississippi, supra,* the focus of the Fourth Amendment scrutiny was the lawless wholesale roundup and detention. The Court recognized that the fingerprinting process might, "under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense." 394 U.S. at 727, 89 S.Ct. at 1398. Earlier, in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Court held the Fourth Amendment prohibited the warrantless intrusion by the police into an individual's body for the purpose of extracting a blood sample absent an emergency situation. Neither case involved a grand jury directive, but both opinions contain the language which forms the basis of the demarcation which the Court subsequently limned between seizure of physical evidence subject to Fourth Amendment scrutiny and that which is not.

In *Davis,* the Court commented upon the limited intrusion which was caused by fingerprinting. The Court stated that "[d]et-

ention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search." 394 U.S. at 727, 89 S.Ct. at 1398. Other characteristics of fingerprinting noted in *Davis* were that fingerprint detention need not be "employed repeatedly to harass any individual, since the police need only one set of each person's prints"; "fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the 'third degree'"; and that "the limited detention need not come unexpectedly or at an inconvenient time" because there is no danger of destruction of fingerprints. *Id.* In *Schmerber*, the Court subjected the warrantless extraction of blood samples to Fourth Amendment scrutiny and found that the extraction was reasonable under the circumstances. The Court, however, employed the relevant Fourth Amendment standard of reasonableness because the search and seizure involved "intrusions beyond the body's surface," and "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence may be obtained." 384 U.S. at 769–70, 86 S.Ct. at 1835.

In *United States v. Dionisio, supra,* and *United States v. Mara, supra,* the Court was presented with seizures in a different context: the evidence requested was as a result of a grand jury directive. In *Dionisio,* the witness was compelled to provide a voice exemplar; in *Mara,* the witness was compelled to provide a handwriting exemplar. In each case the Court of Appeals had held that the government must first make a showing of need for the exemplars which was "reasonable" albeit not necessarily synonymous with probable cause, the same type of showing to which Judge Gibbons in his concurring opinion would subject the directive for hair sampling in this case. In each case, the Supreme Court reversed the

Court of Appeals and held that there was "no justification for requiring the grand jury to satisfy even the minimal requirement of 'reasonableness' imposed by the Court of Appeals" before enforcing its directives ordering production of the physical evidence. *Dionisio,* 410 U.S. at 15, 93 S.Ct. at 772; *see also Mara,* 410 U.S. at 22, 93 S.Ct. at 776. The reason for the distinction was that the seizure of the physical evidence involved "does not involve the 'severe, though brief, intrusion upon cherished personal security' effected [for example] by the 'pat-down' in *Terry* [*v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1881–82, 20 L.Ed.2d 889 (1968)]", and hence did not implicate any interest protected by the Fourth Amendment. *Dionisio,* 410 U.S. at 15, 93 S.Ct. at 772. The Court reasoned that voice and handwriting exemplars are not protected because the Fourth Amendment "provides no protection for what 'a person knowingly exposes to the public'. . . . Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." *Id.* at 14, 93 S.Ct. at 771. The Court cited *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), for the proposition that an individual has no expectation of privacy with respect to that which he knowingly exposes to the public at large, such as voice and appearance. *See also United States v. Doe (Schwartz),* 457 F.2d 895 at 898–899 (2nd Cir.). The Court distinguished *Schmerber* because of the extent of the intrusion into the body entailed by blood sampling.

Shortly thereafter in the same term, the Court again applied this distinction based on the extent and nature of the intrusion. In *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the Court held that police action in taking involuntary and warrantless scrapings from under the fingernails of a suspect which had yielded traces of skin, blood and fabric from the

victim must be subjected to Fourth Amendment analysis. The Court held that "[u]nlike the fingerprinting in *Davis*, the voice exemplar obtained in *United States v. Dionisio* . . . or the handwriting exemplar obtained in *United States v. Mara* . . . the search of the respondent's fingernails went beyond mere 'physical characteristics . . . constantly exposed to the public,'" *id.* at 295, 93 S.Ct. at 2003, although it also held that the search was justified because of exigent circumstances.

■ Thus, the issue before us is whether the compulsion to produce facial and scalp hair samples to a grand jury is more akin to fingerprinting and voice and handwriting exemplars which have been held outside the ambit of Fourth Amendment protection or whether it is more closely aligned with the extraction of blood samples or fingernail scrapings which have been subjected to Fourth Amendment analysis as to reasonableness. Although the issue is admittedly close, we conclude that there is no greater expectation of privacy with respect to hair which is on public display than with respect to voice, handwriting or fingerprints. In the case of blood samples and fingernail scrapings, the bodily seizure requires production of evidence below the body surface which is not subject to public view. In the case of facial and head hair, as well as fingerprints, voice and handwriting exemplars, the evidence is on public view. In his concurring opinion, Judge Gibbons makes the distinction that it is only the "appearance of one's hair that we offer to the public's view." Concurring Typescript op. at 2. When we offer our voice for public consumption, we do not do so with the expectation that the tone, inflections and modulations will be subjected to minute technical analysis any more than we expect that the fingerprints we inadvertently leave will be microscopically analyzed. The latter cannot be distinguished from the possibility of analyzing hair strands which we also normally shed. Judge Gibbons is undoubtedly correct that "while one can expect that his fingerprint might be lifted from a door knob, he does not expect that the offending fingertip will be lopped off," Concurring Typescript op. at 2, but the cutting of a few strands of hair is hardly akin to the amputation of a finger. Nor is it the sort of "annoying, frightening, and perhaps humiliating experience" involved in the police patdown in *Terry v. Ohio*, 392 U.S. at 25, 88 S.Ct. at 1882, which the Court distinguished in *Dionisio*, 410 U.S. at 15, 93 S.Ct. at 772. Rather, in terms of intrusiveness, it is more like the involuntary touching, inking, and pressing of one's finger involved in the process of fingerprinting. If the fingerprints can be subject to compelled disclosure by the grand jury without implicating the Fourth Amendment, it follows logically that the hair strands can as well.

This case arises in the context of a grand jury request, as did *Dionisio* and *Mara*. In those cases, the Supreme Court did not consider whether the same rationale would apply when a suspect is detained by the police, although the reliance on *Davis* in those cases suggests that it would. Police searches, however, present the threshold question of the legality of the initial seizure of the person which, as previously discussed, is not a problem in the grand jury context. As the Court noted in *Dionisio*, 410 U.S. at 11, 15, 93 S.Ct. at 770, 772, in *Davis* the seizure of the persons, held to be illegal, was distinguished from their subsequent fingerprinting, which the Court has since stated was legal. We consider only the applicability of the Fourth Amendment under the facts and in the context before us.

■ Our conclusion does not necessarily end the Fourth Amendment inquiry. There is a two-pronged inquiry which must be made when considering a claim of Fourth Amendment violation. As the Court stated in *Schmerber*, "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." 384 U.S. at 768, 86 S.Ct. at 1834. No issue as to the manner of sampling is raised in

this case,[4] nor has there been any suggestion that the hair sample requested by the grand jury sought the hair root with which Judge Gibbons is concerned. A snip of hair is often adequate for identification purposes. See Imwinkelried, Forensic Hair Analysis: The Case Against the Underemployment of Scientific Evidence, 39 Wash. & Lee L.Rev. 41, 53–58 (1982). We need not decide whether the result might be different were the hair root requested, since the hair root, unlike the exposed hair, is a living structure. At times, constitutional distinctions are as thin as a razor's edge.

### III.

■ Mills cross-appeals from that portion of the district court's order denying his motion to vacate the grand jury's demand that he submit to the measurement of his height and weight. While the preceding discussion bears heavily upon the soundness of that denial, nonetheless we are without jurisdiction to rule squarely on this issue.

Denials of motions to quash grand jury subpoenas are not final orders appealable under 28 U.S.C. § 1291. Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940). In United States v. Ryan, 402 U.S. 530, 532, 91 S.Ct. 1580, 1581–82, 29 L.Ed.2d 85 (1971), "the Court reiterated the continued validity of the holding in Cobbledick 'that one to whom a subpoena is directed may not appeal the denial of a motion to quash that subpoena but must either obey its commands or refuse to do so and contest the validity of the subpoena if he is subsequently cited for contempt on account of his failure to obey.'" In re Establishment Inspection of Consolidated Rail Corp., 631 F.2d 1122, 1123 (3d Cir. 1980). The rule of Cobbledick

> is solidly grounded in the policy that the workings of the investigatory process should remain unfettered. If an ongoing grand jury proceeding could be interrupted each time that a potential witness or holder of relevant records wished to con-

test an appearance or disclosure, the ability of grand juries promptly to perform their task would be seriously compromised . . . .

In re Grand Jury Empanelled August 14, 1979, 638 F.2d 1235, 1236 (3d Cir. 1981). Cross-appellant Mills argues that this supporting rationale does not apply in the instant case since "Mills did not interrupt the grand jury's investigation in this matter; he simply cross-appealed from the government's interruption thereof." Brief of Appellee/Cross-Appellant at 1. This argument fails to recognize that the interruption of the grand jury's investigation was occasioned initially by Mills' refusal to comply with the grand jury's directive, and subsequently by the court's grant of Mills' motion to vacate the order compelling production of the hair sample, not by the government's appeal from that court order. See Cobbledick, 309 U.S. at 329 n.6, 60 S.Ct. at 543 n.6. Furthermore, Mills' assertion that adjudication of the cross-appeal now, in connection with the government's appeal, will actually expedite rather than impede the grand jury investigation is unsupportable. As noted by the government, if not for the cross-appeal, the grand jury might now be in possession of sufficient information relating to Mills' physical dimensions to clear him of suspicion or possibly to indict him, assuming that Mills would have chosen to comply with the court order rather than face contempt. In addition, although review by this court of the cross-appeal now might serve the sound judicial policy against piecemeal appellate adjudication, that policy is itself grounded in the desire for expeditious administration of justice, Cobbledick, 309 U.S. at 325, 60 S.Ct. at 541, and therefore the goal of unified appellate presentation must yield to the necessity of avoiding unnecessary obstructions to the orderly progress of the grand jury's investigation. Id. at 327–28, 60 S.Ct. at 542–43; In re Grand Jury Empanelled August 14, 1979, 638 F.2d at 1236.

---

4. By the terms of the district court's original order sampling is to be accomplished under the supervision of a duly authorized agent of the Grand Jury and is to be effected by a doctor or other trained medical personnel, see note 3 supra.

Accordingly, Mills' cross-appeal falls squarely within the holding and rationale of *Cobbledick*. The district court's denial of Mills' motion is not a final order appealable under § 1291 and Mills is left "to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt." *United States v. Ryan*, 402 U.S. at 533,[5] 91 S.Ct. at 1582.

### IV.

In No. 81–2703 the order appealed from will be reversed. In No. 81–2808 the appeal will be dismissed.

GIBBONS, Circuit Judge, concurring.

I join in the court's judgment, and in Part III of the opinion dismissing the appeal in No. 81–2808. I agree with the majority's conclusion that the order appealed from in No. 81–2703 must be reversed, but for reasons substantially different from those relied upon by Judge Sloviter. In my view a grand jury directive to submit to the sampling of head and facial hair is a seizure within the meaning of the fourth amendment. However, because it is ordered by the court pursuant to a valid grand jury subpoena, such a seizure is reasonable and, therefore, not contrary to the fourth amendment.

### A.

The Supreme Court's holdings in *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), and *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), which denied fourth amendment protection to grand jury compelled production of voice and handwriting exemplars, involved a two-step analysis. 410 U.S. at 9, 93 S.Ct. at 769. First, the Court examined the claim of fourth amendment protection with respect to the grand jury's subpoena to appear, and concluded that such a summons is not a "seizure" of the individual in the fourth

amendment sense. *Id.* It has been noted that though attendance before a grand jury may be burdensome, it is "necessary to the administration of justice," *Blair v. United States*, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919), and that a grand jury subpoena is unlike an arrest, *United States v. Doe (Schwartz)*, 457 F.2d 895, 898 (2d Cir. 1972). Accordingly, the Court distinguished the "lawless dragnet detention" of twenty-four individuals by the police for fingerprinting in *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1968), from the grand jury summoning by subpoena of twenty people to give voice exemplars in *Dionisio*.

"*Davis* is plainly inapposite to [ *Dionisio* ] where the initial restraint does not itself infringe the Fourth Amendment."

410 U.S. at 11, 93 S.Ct. at 770. In the instant case, Mills argued in support of his motion before the district court for vacation or modification of the original enforcement order that

there is nothing in the government's papers to dispel the disquieting possibility that the U.S. may be operating a simple dragnet aimed at every black male of appropriate physical stature in the Wilmington area to obtain hair samples....

16a. I agree with the majority that any assertion that such a "grand jury dragnet" is prohibited by the fourth amendment is now untenable in light of the Supreme Court's conclusion in *Dionisio*.

The Supreme Court in *Dionisio* considered second whether the grand jury's directive to a witness to make a voice recording was a seizure within the meaning of the fourth amendment. The Court held that voice recording (like photographing, production of handwriting exemplars, fingerprinting, and lineup appearances) does not constitute such a seizure. In reaching this conclusion, the Court enlisted two related explanations of constitutional privacy. First, the Court cited *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), for the proposition that an individ-

---

5. We need not reach the further issue of the timeliness of Mills' cross-appeal, and the predicate question of whether a grand jury investigation is a "criminal case" within the meaning of Fed.R.App.P. 4(b).

ual has no expectation of privacy with respect to that which he exposes to the public at large, such as voice and appearance. *See also, United States v. Doe (Schwartz),* 457 F.2d at 898–99. While it can be argued that we constantly expose our hair to the public, it is more correct to note that it is only the appearance of one's hair that we offer to the public's view. We do not offer the hair itself for others to clip or comb through. For example, while one can expect that his fingerprint might be lifted from a door knob, he does not expect that the offending fingertip will be lopped off. In a very real sense, then, individuals have an expectation of privacy with respect to their hair, an expectation that others will not comb through it, pull it, or clip it without their consent.[1] This "expectation of privacy" explanation differs in its perspective from the second indicator of fourth amendment privacy interests cited by the Court in *Dionisio,* that of the intrusiveness of the particular means of search or seizure involved. The Court recognized that the recording of a voice is an action significantly different in character from the introduction of a needle into the body to extract blood as in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), or from the "annoying . . . and perhaps humiliating experience," *Terry v. Ohio,* 392 U.S. 1, 24–25, 88 S.Ct. 1868, 1881–82, 20 L.Ed.2d 889 (1967), of being "patted down." Thus, under the analysis employed in *Dionisio,* a fourth amendment privacy interest and, therefore, a "search or seizure" within the meaning of the fourth amendment, can be recognized by examining both our privacy expectations with respect to that which is to be searched or seized, and the intrusiveness of the means by which the search or seizure is to be effected.

In this case these indicia merge. The fourth amendment expectation of privacy here is that the government will not detain us unwillingly to comb through, pull or clip our head and beard hairs. Doing so is as least as great an intrusion as a pat down or a fingernail scraping. Therefore, such an action is a search and seizure within the meaning of the fourth amendment. As was noted in *United States v. D'Amico,* 408 F.2d 331, 332 (2d Cir. 1969), even prior to *Dionisio* and *Mara* :

> Unquestionably the clipping of the few strands of appellant's hair by a federal agent constituted a "seizure" that might conceivably be subject to the "constraints of the Fourth Amendment," *Schmerber v. Calif.* [citation omitted].

Where the government's action involves the uninvited laying on of hands to perform a search, as in *Terry v. Ohio* (patdown), or to obtain a material thing, as in *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1972) (samples from under fingernails), and *Bouse v. Bussey,* 573 F.2d 548 (9th Cir. 1977) (pubic hair samples); *cf. United States v. Richardson,* 388 F.2d 842 (6th Cir. 1968) (examination under ultraviolet light of defendant's hands for evidence of fluorescein powder held not to be a search or seizure), or where the action involves an actual invasion of the body, as in *Schmerber* (blood extraction), *see also United States v. Allen,* 337 F.Supp. 1041, 1043 (E.D.Pa. 1972) (X-rays), the action is a search and seizure under the fourth amendment.[2]

The distinction which I draw between government actions which are searches and seizures and those which are not is perhaps a fine one, but, nonetheless principled. The sampling of a few strands of hair may be among the least compelling examples of a seizure; the distinction, however, is easy to understand and apply, and is amply sup-

---

1. The conclusion that individuals generally hold such an expectation is bolstered by the fact that great expense and effort are often devoted to grooming and maintaining our hair, as well as by the social, political and even religious symbolic significance often attached to one's cut of hair and beard.

2. The result in the instant case would be less certain had the government merely demanded that Mills turn over hair samples rather than submit to their being removed by others. This variation of the facts is not offered here, nor is it likely to be in the future given the difficulty in authentication which such a procedure would yield.

ported by case precedent. Although it might be easier to rule simply that the sampling of head and facial hair is not a fourth amendment seizure and end the inquiry there, as in *Dionisio* and *Mara*, such a ruling creates the anomaly that nearly identical actions may or may not be termed "searches and seizures" and given fourth amendment scrutiny depending only upon who in the government performs them, the police or agents of the grand jury. The context in which a search or seizure is performed should not change what we call the action, but rather should inform as to the reasonableness of the search or seizure. An action which constitutes a search or seizure when undertaken by an instrument of law enforcement other than a grand jury should be given the same fourth amendment scrutiny when taken by an agent of the grand jury pursuant to a court order, even though the fact that a grand jury is acting is likely to render the search or seizure a reasonable one.[3] Use of the grand jury process to obtain evidence in other than testimonial and documentary form appears to be a recent development, and certainly has great potential for expanded application.[4] Concern that the grand jury process may be abused and come to largely usurp the traditional means of gathering physical evidence was expressed by the dissenters in *Mara*. 410 U.S. at 49, 93 S.Ct. at 790. Acknowledging a search or seizure and then scrutinizing it in light of the aim of the fourth amendment—that it not be unreasonable in the circumstances—provides the framework within which more extreme grand jury seizures of physical evidence can be handled in the future. *See Terry v. Ohio,* 392 U.S. at 9, 88 S.Ct. at 1873.

The Opinion of the Court here, unsuccessfully distinguishing the *Terry v. Ohio* holding regarding protective patdowns, views the sampling of head and facial hair as being more akin to fingerprinting and the taking of voice and handwriting exemplars than to fingernail scraping and blood sampling. In Judge Sloviter's opinion the issue turns on a distinction between evidence found below the body surface and that which is subject to public view or offered for public consumption. Although this distinction draws a clear and easily applied line, it fails to take adequate account of individuals' expectations of privacy or of the objectionable means by which such personal physical evidence is likely to be seized, the prime indicia of fourth amendment interest. Moreover, forensic hair analysis often will require scientific testing of hair roots and the sheaths of epithelial tissue surrounding the roots *in vivo*,[5] which are as much below the surface of the body as are fingernail scrapings. Finally, the distinction fails to take into account the patent fact that hair, whether above or below the skin's surface, is the property of the grower, not the government, and is actually seized when cut and removed from the body of the owner.

## B.

Although the compelled sampling of head and facial hair is a seizure within the mean-

---

3. The fourth amendment's prohibition of unreasonable searches and seizures has often been applied against demands of the grand jury. Hale v. Henkle, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Schwimmer v. United States, 232 F.2d 855, 861 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956) ("the test to be applied under [the fourth amendment] ... is whether the thing done or attempted to be done, in the sum of its form, scope, nature, incidents and effect, impresses as being fundamentally unfair or unreasonable in the specific situation, when the immediate end sought is considered against the private right affected.").

4. With respect to hair samples it was recently noted in Time Magazine that
A single strand can reveal a person's sex, race and certain other characteristics, and experts now have the ability to read far more from a sample. Says New York City Forensic Serologist Dr. Robert Shaler: "The hair is the garbage can of the human body. Everything you eat shows up there." Knowing that it grows about 1 mm a day, Shaler insists, "we can tell if you took aspirin yesterday and drank beer from an aluminum can a week ago." Until now, only Sherlock Holmes could deduce so much from so little. Time, *Law: Mr. Wizard Comes to Court,* March 1, 1982, at 90.

5. *See* Imwinkelried, *Forensic Hair Analysis: The Case Against the Underemployment of Scientific Evidence,* 39 Wash. & Lee L.Rev. 41, 48, 51 (1982).

ing of the fourth amendment, the amendment provides protection only against "unreasonable" searches and seizures, and requires that no warrants shall issue except upon a showing of probable cause. This case does not involve the issuance of a search warrant pursuant to Fed.R.Crim.P. 41, but rather concerns the district court's order with respect to a subpoena issued under Fed.R.Crim.P. 17. Accordingly, no warrant requirement is implicated which would necessitate a showing of probable cause. Furthermore, the absence of probable cause does not necessarily render a warrantless search or seizure "unreasonable." *E.g., Terry v. Ohio* (no probable cause necessary for a protective patdown). Probable cause is not the sine qua non of reasonableness in the grand jury context, *In re Riccardi*, 337 F.Supp. 253, 255 (D.N.J. 1972), and when an order of the district court is involved—as opposed to a warrant—the relevant test is merely one of reasonableness. *United States v. Doe (Schwartz)*, 457 F.2d at 901. Indeed, the appropriate inquiry is not limited to whether it is reasonable not to obtain a search warrant, but should consider whether the search or seizure itself is reasonable under the circumstances. *United States v. D'Amico*, 408 F.2d at 333 (quoting *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967)). Accordingly, the proposition stated by the district court—that because the grand jury's demand is a seizure under the fourth amendment probable cause must be shown, and because there are no exigent circumstances a warrant must issue—should be rejected. *Contra, United States v. Allen*, 337 F.Supp. 1041, 1043 (E.D.Pa.1972).

The reasonableness of the proposed seizure of Mills' hair must therefore be examined. My thesis is that the seizure is reasonable precisely because it is effected under the authority of a court order enforcing a grand jury subpoena, rather than by the police, FBI, or other government agency unsupervised by the court. This is the alternative holding suggested by the Court in *United States v. Doe—i.e.*, that even if the grand jury compulsion of voice and handwriting exemplars were considered a "seizure," the demand is reasonable because the directive emanates from the grand jury and its process is not self-enforcing. 457 F.2d at 899–900.[6]

The composition of the grand jury and the procedures followed by it provide considerable protection against unreasonable searches and seizures for individuals subpoenaed and from whom physical evidence is sought. As stated in *Doe*:

> The safeguards built into the grand jury system, such as enforced secrecy and the use of court process rather than the constable's intruding hand as a means of gathering evidence, severely limit the intrusions into personal security which are likely to occur outside the grand jury process.

457 F.2d at 899.

First, this court has previously recognized that grand juries are

> 'basically a law enforcement agency' .... They are for all practical purposes an investigative and prosecutorial arm of the executive branch of government [citations omitted].

*In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85, 90 (3d Cir. 1973). Nonetheless, twenty-three private citizens, the members and foreman of the grand jury, are interposed between the raw will of the prosecution and the privacy interests of individuals

---

**6.** The analysis here is also similar to that employed by the Second Circuit in *D'Amico*. In that case, the taking of scalp hair samples was found to be a seizure within the fourth amendment. In contrast to the instant case, at the time of the seizure from D'Amico he was under arrest for the crime being investigated, and so presumably probable cause to search existed. Such a situation is most similar to that of a search incident to arrest. *See, e.g.,* Blackford v. United States, 247 F.2d 745 (9th Cir. 1957)

(police doctor's removal of narcotic from defendant's rectum incident to arrest for illegally importing drugs, without a search warrant, held not violative of fourth amendment). Under the circumstances in *D'Amico*, the court found the relatively minor intrusion of sampling hair to be a reasonable seizure. In the instant case, reasonableness is found, not in the existence of probable cause, but in fact that the seizure is an action of the grand jury.

subpoenaed. The members of the grand jury provide a check upon the aggressive tendencies of zealous government prosecutors. As Judge Friendly notes in *United States v. Doe*:

> an important aspect of the grand jury's function [is] that of acting as a protective buffer between the accused and the prosecution. The grand jury was regarded by the founders, not as an instrument of oppression but a safeguard of liberty. . . .

457 F.2d at 899; *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962).

Secondly, an appearance before the grand jury is vastly different from an encounter with the police. It is unlike a sudden and frightening roadside stop, an embarrassing and perhaps humiliating intrusion into the home or work place, or an intimidating and stigmatizing police station confrontation, the usual contexts in which police and FBI searches and seizures occur. On the contrary, an individual from whom physical or testimonial evidence is sought by a grand jury travels to the courthouse in response to a subpoena. He has notice, and therefore may easily choose to consult counsel ahead of time. To a certain extent, the individual called may even adjust the time of appearance to his own convenience. Also grand jury proceedings are secret, Fed.R. Crim.P. 6(e), and therefore tend to insulate exposed private affairs from public scrutiny. *See United States v. Doe (Schwartz)*, 457 F.2d at 898–99; Note, *United States v. Dionisio: The Grand Jury and the Fourth Amendment*, 73 Colum.L.Rev. 1145 (1973).

Thirdly, demands of the grand jury are not self-enforcing. A witness may defy the grand jury's directive and move to quash or modify the subpoena, thereby gaining review of the grand jury's action by a judicial officer. Fed.R.Crim.P. 17(g); 8 Moore's Federal Practice, ¶ 17.10–11. In addition, since the proceedings on such motions are not generally ex parte,[7] the individual is

afforded greater protection by his presence and ability to challenge the demand than he would receive during the ex parte application for a warrant.

Lastly, the supervisory power of the courts over the grand jury and over the enforcement of subpoenas empowers the courts to investigate the relevancy and proper purpose of a grand jury investigation. In this circuit the government is required to make a minimum showing by affidavit in every case that each item sought by the grand jury is relevant to an investigation properly within the grand jury's jurisdiction, and is not sought primarily for some other purpose. *In re Grand Jury Proceedings (Schofield II)*, 507 F.2d 963, 966 (3d Cir. 1975); *Schofield I*, 486 F.2d 85 (3d Cir. 1973). This requirement is a considerable protection against grand jury abuse and invasion of privacy. The requisite showing has been made in the instant case. Additionally, since a grand jury demand for physical evidence should be viewed as a subpoena duces tecum—*i.e.*, a subpoena for the "production of . . . objects," Fed.R.Crim.P. 17(c)—such demands fall within the "unreasonable or oppressive" standard of Rule 17(c). *See generally* 8 Moore's Federal Practice ¶ 17.07.

Thus, the procedures whereby a grand jury may obtain physical evidence are significantly solicitous with respect to an individual's fourth amendment rights, rendering demands more reasonable when made by the grand jury than they might otherwise be.

Any minimal residuum of fourth amendment exposure left unprotected by grand jury procedure must yield to the legitimate interest of the grand jury in the effective administration of criminal justice. Due to the critical importance of the grand jury's role in meeting "the twofold aim [of criminal justice] . . . that guilt shall not escape or innocence suffer," *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), burdens of re-

---

**7.** Also, affidavits submitted to the court to meet the requirements of *Schofield I* should be disclosed to the witness during the enforcement proceeding, absent extraordinary circumstances. *Schofield I*, 486 F.2d at 93.

sponse to the demands of the grand jury, which might otherwise be intolerable, must often be borne by the individual. While the duty to comply with grand jury demands may at times be onerous, it is essential to the effective administration of justice. "The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public." *Blair v. United States,* 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919); *see also Dionisio,* 410 U.S. at 9–10, 93 S.Ct. at 769–70; *Garland v. Toree,* 259 F.2d 545, 549 (1958). This civic obligation is no less for an individual who may himself be the subject of the grand jury's inquiry. *United States v. Winter,* 348 F.2d 204, 207–08 (2d Cir. 1965).

The public duty to cooperate with the grand jury arises from the importance of that body's constitutional task. The institution of the grand jury "in our Constitution as the sole method for proffering charges in serious criminal cases shows the high place it held as an instrument of justice." *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).

> Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad.

*Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1971).

> It is a grand inquest, or body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety, or forecasts of the probable result of the investigation....

*Blair v. United States,* 250 U.S. at 282, 39 S.Ct. at 471. As noted also in *Branzburg,* although the powers of the grand jury are subject to certain limitations,

> the longstanding principle that "the public ... has a right to every man's evidence," except for those persons protected by a constitutional, common law, or statutory privilege, *United States v. Bryan,* 339 U.S. [323] at 331 [70 S.Ct. 724 at 730, 94 L.Ed. 884]; *Blackmer v. United States,* 284 U.S. 421, 438 [52

S.Ct. 252, 255, 76 L.Ed. 375] (1932), ... is particularly applicable to grand jury proceedings.

408 U.S. at 688, 92 S.Ct. at 2660; *see also Dionisio,* 410 U.S. at 9–10, 93 S.Ct. at 769–70; *United States v. Nixon,* 418 U.S. 683, 707–13, 94 S.Ct. 3090, 3107–3110, 41 L.Ed.2d 1039 (1973).

While the seizure of head and facial hair should under other circumstances require a warrant based on probable cause, in the context of a grand jury investigation Mills' minimal fourth amendment privacy interests must yield to the interests served by the grand jury as an institution. To require any greater showing by the government than that already offered would unnecessarily

> saddle a grand jury with mini-trials and preliminary showings [which] would impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws.

*Dionisio,* 410 U.S. at 17, 93 S.Ct. at 773. Recognition of the fourth amendment requirement that a seizure not be unreasonable does not predetermine that the government must make a case by case showing of the reasonableness of each particular grand jury demand, as was urged by Justice Marshall in his *Mara* dissent. 410 U.S. at 48, 93 S.Ct. at 789. A demand for hair samples, when made by a grand jury, is reasonable without any greater showing in the particular case than that already required in this circuit under *Schofield I.*

Since the district court wrongly imposed the requirement that the government procure a search warrant, I agree that its judgment in this respect must be reversed.