Keith L. **THOMPSON**, Defendant Below, Appellant,

v.

**STATE** of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Dec. 17, 1987.
Decided: March 28, 1988.

Robert Phillips (argued) and David Facciolo, Asst. Public Defenders, Wilmington, for appellant.

Ferris W. Wharton (argued) and Loren Meyers, Deputy Attys. Gen., Wilmington, for appellee.

Before CHRISTIE, C.J., WALSH and HOLLAND, JJ.

HOLLAND, Justice:

The appellant, Keith L. Thompson ("Thompson"), was tried before a jury in the Superior Court in and for New Castle County. He was convicted of Rape First Degree, Kidnapping First Degree and Assault First Degree. Thompson was sentenced to life imprisonment on the rape charge,[1] to life imprisonment on the kidnapping charge, and to two years imprisonment on the assault charge.

The central issue on appeal is whether Thompson's warrantless felony arrest was made with probable cause. The underlying issue on appeal is whether the Superior Court erred in not granting a motion to suppress evidence that was obtained incident to Thompson's arrest. We have concluded that there was probable cause for Thompson's warrantless felony arrest based upon our examination of the record and an evaluation of the probative value of the forensic hair analysis, relied upon in part by the police. Accordingly, we affirm the Superior Court's decision to deny Thompson's motion to suppress. Therefore, we also affirm Thompson's convictions.

## Facts

On July 28, 1984, an eight–year–old girl ("victim") was sleeping in a bed at her grandmother's house on Bowers Street in Wilmington.[2] At approximately 5:00 a.m., a black male burglar carried the victim out of the house and into the backyard where he undressed the victim and attempted to rape her. When the victim screamed, the man struck her in the face and carried her to a nearby dump site. There she was placed upon a mattress, again struck in the face, and raped by the man. After the victim pretended she was dead, the man left the dump site. The victim ran back to her grandmother's house. Her uncle called the police who arrived at the house at approximately 5:20 a.m. The physician who later treated the victim testified that her injuries were consistent with rape.[3]

During their investigation, the police found a mattress inclined against a hill on the edge of the dump site. The police removed a section of the mattress cover that had a red substance on it. Nearby, the police discovered shoe prints and a barefoot print in the mud. The police made plaster casts of several of these prints. At the grandmother's house, the police collected a blanket that was wrapped around the victim and the sofa cushion upon which the victim sat after the rape. The police were able to obtain hair samples from the mattress cover, the blanket, and the sofa cushion.

On September 9, 1984, at 3:15 a.m., a similar crime occurred at the Royal Oaks Apartments in New Castle County outside of the City of Wilmington.[4] In that incident, a black male burglar took a nine–year–old girl from her bedroom in a first floor apartment into the apartment's living room. The burglar undressed her and was apparently preparing to commit a sexual offense against her when the girl awoke, causing the burglar to flee. The police were called immediately. Approximately twenty to thirty minutes later, a Delaware State policeman stopped Thompson about a mile from where the incident occurred be-

---

1. This life sentence included a provision that Thompson be incarcerated for a minimum mandatory period of twenty years.

2. The incident which resulted in Thompson's convictions will be referred to as the Bowers Street case.

3. The victim was hospitalized for several days as a result of her injuries.

4. This incident will be referred to as the Royal Oaks case.

cause he fit the general description of the suspect. Thompson stated that he was jogging. Thompson was taken back to the crime scene and positioned fifty feet away from the girl's apartment. It was still dark outside, and she was unable to identify him at that time. Several days later, however, when viewing a photographic line-up, the girl in the Royal Oaks case picked out Thompson's picture. Although she would not positively identify him as her assailant, she stated that Thompson "might be the one," indicating that his degree of resemblance, on a scale of one to ten, was a ten.

On September 21, 1984, Thompson was requested to voluntarily accompany detectives from the New Castle County Police Department to their headquarters for further questioning about the Royal Oaks case. After he was questioned, Thompson consented to the taking of fingerprints and voluntarily provided samples of his head and pubic hair. Detective Dennis E. Godek ("Detective Godek"), of the New Castle County Police Department, took these hair samples from Thompson to the Federal Bureau of Investigation (FBI) Laboratory in Washington, D.C. on that same day. There, Detective Godek turned the hair samples over to Special Agent H. Michael Warren ("Special Agent Warren") of the Microscopic Laboratory, Hairs and Fibers Section.

Thompson's head hairs were compared microscopically to three head hairs from the Bowers Street case—one from the mattress cover, one from the blanket, and one from the sofa cushion. Based upon this analysis, Special Agent Warren concluded that Thompson's hair and the hair evidence from the Bowers Street case exhibited the same characteristics. He told Detective Godek that hair comparisons, unlike fingerprint comparisons, do not result in positive identification. However, he was relatively sure that the hairs from the Bowers Street case came from Thompson because in his seven years of conducting hair comparisons, he had never found head hairs from two different people, even twins, that exhibited the same characteristics.

Detective Godek telephoned the results of the hair comparisons to his commanding officer. Detective Godek then immediately returned to the Wilmington police station and met with the Wilmington police officers who were investigating the Bowers Street case. Soon thereafter, on the night of September 21, 1984, those officers made a warrantless felony arrest of Thompson. The Bowers Street victim viewed a line-up which included Thompson following his arrest. The victim stated that one of the men in the line-up looked something like her assailant. She selected number four in the line-up as the person most closely resembling her assailant. Number four was Thompson. The tennis shoes Thompson was wearing at the time of his arrest were seized as evidence in order to compare them to the plaster casts made at the Bowers Street rape scene.

Thompson argues on appeal that his warrantless arrest was based solely upon the hair comparisons which do not constitute probable cause. Although Thompson acknowledges that hair comparisons can be relevant evidence, he contends that this microscopic analysis is an unreliable indicator of positive identity and as such cannot be relied upon exclusively to support a probable cause determination. Since his arrest was therefore illegal, Thompson further argues that any evidence obtained during this period of illegal detention is "fruit of the poisonous tree" and should have been excluded under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963). The State argues that the probable cause determination was not based exclusively upon the hair comparisons, but upon the totality of the circumstances which included the fact that Thompson was a suspect in the Royal Oaks case.

### Probable Cause for a Warrantless Arrest

We begin our analysis with the authority of a peace officer to make a legal arrest without a warrant. The statutory authority of Delaware law enforcement officers to make felony arrests without a warrant is limited to offenses committed in their pres-

ence or to instances where they have "reasonable ground to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." 11 *Del. C* § 1904(b)(1). A similar federal statute has been held to meet the constitutional requirement that no arrest warrant issue except "upon probable cause." *Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959).

The *Henry* Court observed that the requirement of probable cause is deeply rooted in the history of Anglo-American law:

> The general warrant, in which the name of the person to be arrested was left blank, and the writs of assistance, against which James Otis inveighed, both perpetuated the oppressive practice of allowing the police to arrest and search on suspicion. Police control took the place of judicial control, since no showing of "probable cause" before a magistrate was required.

*Id.* (footnotes omitted).[5] Rumor, suspicion, or even "strong reason to suspect" has never been adequate in American legal history to support a warrant for arrest. *Id.* at 101, 80 S.Ct. at 170. *A fortiori*, mere suspicion cannot support a warrantless arrest.

█ The Delaware statute which authorizes warrantless arrests requires "reasonable ground to believe" the person to be arrested has committed a felony. 11 *Del. C.* § 1904(b)(1). Given the fact that suspicion alone is insufficient justification for a warrantless arrest, this statute can only pass constitutional muster if "reasonable ground to believe" is construed to mean probable cause. This Court has found this to be an appropriate interpretation of a similar statute, 11 *Del. C.* § 1935, which authorizes "pursuit" in order to arrest a person when there is "reasonable grounds to suspect" a felony has been committed. *State v. Cochran*, Del.Supr., 372 A.2d 193,

195 (1977). In *Cochran*, we held that the phrase "reasonable grounds to suspect" is the legal equivalent of probable cause. *Id.* We now hold that the phrase "reasonable ground to believe" is also the legal equivalent of "probable cause" and should be accorded the same meaning. *See id.; Thomas v. State*, Del. Supr., 467 A.2d 954, 957 n. 3 (1983) (citing *United States ex rel. Mealey v. Delaware*, 352 F.Supp. 349, 353 (D.Del.1972)).

However, the identification of "probable cause" as the standard by which to measure the propriety of a warrantless felony arrest begins rather than ends our inquiry. We have long recognized that "[p]robable cause is an elusive concept which avoids precise definition." *State v. Cochran*, 372 A.2d at 195. It lies " 'somewhere between suspicion and sufficient evidence to convict.' " *Id.* (quoting *United States v. Thompson*, 292 F.Supp. 757, 761 (D.Del. 1968)).

The United States Supreme Court has concluded that the central teaching of its "decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.' " *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed. 2d 527 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). The *Gates* Court concluded that probable cause must be measured by the totality of the circumstances. It rejected a specific test in favor of a case-by-case review of " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* (quoting *Brinegar v. United States*, 338 U.S. at 175, 69 S.Ct. at 1310)).

The absence of a specific test for probable cause does not mean there are no guidelines. For example, when an arrest is made without a warrant, the requirements to satisfy a determination of probable

---

**5.** In 1776, Section 17 of the Delaware Declaration of Rights and Fundamental Rules provided:

> That all warrants without oath to search suspected places, or to seize any person or his property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend all persons suspected, without naming or describing the place or any person in special, are illegal and ought not to be granted.

1 *Del. Laws* app. at 81 (1797).

cause must be at least equal to those where an arrest warrant is obtained. *Wong Sun v. United States*, 371 U.S. at 479, 83 S.Ct. at 412. "Otherwise, a principal incentive now existing for the procurement of arrest warrants would be destroyed." *Id.* at 479–80, 83 S.Ct. at 413 (footnote omitted). Chief Justice Herrmann articulated the standard for determining the existence of probable cause in *Garner v. State*, Del. Supr., 314 A.2d 908 (1973).

The law requires for all valid arrests, with or without warrants, that police officers possess information which would warrant a reasonable man in believing that a crime had been committed. The determination of whether such probable cause exists is essentially a balancing test wherein the necessities of effective law enforcement are measured against the constitutional rights of citizens to be protected against arbitrary police action.

*Id.* at 910–11 (citations omitted).

The factual basis for the warrantless felony arrest must be disclosed to the court when the basis for arrest is challenged. Thompson argues that there was no probable cause for his warrantless felony arrest. *See Wong Sun v. United States*, 371 U.S. at 479, 83 S.Ct. at 412. The Superior Court determined that reasonable, prudent men, in the same position as the Wilmington police, would have concluded that they had probable cause to arrest Thompson for the Bowers Street rape. *Cf. Henry v. United States*, 361 U.S. at 102, 80 S.Ct. at 171. "The quantum of information which constitutes probable cause—evidence which 'would warrant a man of reasonable caution in the belief' that a felony has been committed—must be measured by the facts of the particular case." *Wong Sun v. United States*, 371 U.S. at 479, 83 S.Ct. at 413 (citation omitted) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). Accordingly, we now must weigh and measure the facts in this case.

*Forensic Hair Analysis in This Case*

Thompson's arrest followed an FBI comparison of the hair samples that Thompson had voluntarily given to the police during the Royal Oaks investigation with the hair evidence that had been gathered from the Bowers Street incident. Our examination begins with a review of why the FBI hair analysis was requested by the Delaware police.

The City of Wilmington police were continuing to investigate the Bowers Street case when the Royal Oaks attack occurred outside of the City of Wilmington in New Castle County. As a result of the cooperation between the respective investigating law enforcement agencies, it was discovered that both crimes involved a nighttime burglary by a black male and the sexual assault of a young female victim who was abducted from her bedroom. Hair samples were gathered during the course of both investigations. The Royal Oaks investigation also resulted in the victim's tentative identification of Thompson, who was discovered jogging in the area of the crime in the early morning hours shortly after it had been reported. The Delaware police suspected that there might be a connection between the Bowers Street case and the Royal Oaks case due to the similarity of the incidents.

The testimony at the suppression hearing revealed that on Friday, September 21, 1984, the known hair samples of Thompson were transported to the FBI Laboratory in Washington, D.C. by Detective Godek of the Wilmington Police Department. Detective Godek met with Special Agent Warren, who was assigned to observe and compare the known hair samples from Thompson with the hair evidence that had been recovered in both Delaware cases. Detective Godek remained at the FBI Laboratory while Special Agent Warren performed the microscopic hair analysis. Detective Godek described his observations at the suppression hearing.

Well, I sat there as [Special Agent Warren] compared them, and he looked at three separate hairs from the scene of the [Bowers Street] case. One head hair was found on a blanket. One was a head hair found on a green seat cushion. And one was a head hair found on a mattress cover. He compared those with head

hairs of Keith Thompson, and he told me that he felt that there was a positive comparison. Special Agent Warren told me that hair identification is not a positive identification such as fingerprints, but that he felt that there were enough similarities between the questioned hairs and the head hairs, known head hairs of Keith Thompson, for him to be relatively sure that those head hairs came from Keith Thompson.[6]

Special Agent Warren's own testimony at trial was that he has never found head hairs from different individuals, even twins, that he could not tell apart and more specifically that:

> I can only testify that the hairs present on those items exhibit the same characteristics as his head hair. The fact that we have in this instance three hairs, three separate locations, it is highly probable that those hairs came from Mr. Thompson.

Detective Godek immediately telephoned his commanding officer, Lieutenant Thomas Gordon, to report Special Agent Warren's opinion. Lieutenant Gordon then contacted the Wilmington police to arrange for a meeting of Detective Godek with the investigating officers in both Delaware cases. Detective Godek returned to Delaware that same day. He arrived at the Wilmington police station at about 10:00 p.m. Thompson had already been brought to the Wilmington police station for questioning. Detective Godek personally reported the results of the FBI hair analysis to the investigators who also compared their other information about the similarity between the two Delaware cases. Thompson was arrested for the Bowers Street rape at approximately 11:00 p.m.

*History of Forensic Hair Analysis*

One of the earliest reported cases involving the consideration of the use of forensic hair analysis in a criminal case was decided more than one hundred years ago. *Knoll v. State*, 55 Wis. 249, 12 N.W. 369 (1882). Since that time, evidence of the results from a scientific analysis of hair has been considered extensively by courts in every state. *See* Annotation, *Admissibility and Weight, in Criminal Case, of Expert or Scientific Evidence Respecting Characteristics and Identification of Human Hair*, 23 A.L.R.4th 1199 (1983). This subject has also been addressed in many scholarly publications. *See, e.g.*, Imwinkelried, *Forensic Hair Analysis: The Case Against the Underemployment of Scientific Evidence*, 39 Wash. & Lee L.Rev. 41 (1982); Gaudette, *Forensic Hair Comparisons*, 12 Crime Laboratory Dig. 44 (1985); Annotation, *Hair Analysis*, 38 P.O.F.2d 377 (1984); Note, *The Use of Scientific Evidence in Rape Prosecutions*, 18 U.Rich.L.Rev. 851, 862–64 (1984).

This Court has held that a fingerprint match is so conclusive that it alone constitutes probable cause for a warrantless felony arrest. *Thomas v. State*, Del.Supr., 467 A.2d 954, 957 (1983). However, it is now universally recognized that although fingerprint comparisons can result in the positive identification of an individual, hair comparisons are not this precise. *See* Miller, *Procedural Bias in Forensic Science Examinations of Human Hair*, 11 L. & Hum.Behav. 157, 158 (1987); Federal Bureau of Investigation, U.S. Dep't of Justice, *Microscopy of Hair: A Practical Guide and Manual* 7 (1977).

---

**6.** The written FBI report stated that the three head hairs from the Bowers Street case "exhibit the same microscopic characteristics" as the head hair samples obtained from Thompson. It then stated: "Accordingly, these hairs or hair fragments could have come from KEITH THOMPSON." The report continued, stating that it "should be understood that hair comparisons do not constitute a basis for positive personal identification."

The report further stated that a "dark brown to black pubic hair of Negroid origin" from the Bowers Street case "exhibits both similarities and differences when compared to the ... pubic hairs identified as having come from KEITH THOMPSON.... Consequently, no conclusion could be reached as to whether or not the [Bowers Street case] pubic hair could have come from KEITH THOMPSON."

This report was prepared in accordance with the FBI's procedures as set forth in Federal Bureau of Investigation, U.S. Dep't of Justice, *Microscopy of Hair: A Practical Guide and Manual* 41 (1977).

Years ago, this Court acknowledged the fact that hair comparisons are not as positive in identification as are fingerprints. *Parson v. State*, Del.Supr., 222 A.2d 326, 331 (1966).[7] Nevertheless, this Court has held that hair identification testimony is properly admitted into evidence at trial:

At trial, an F.B.I. agent testified as an expert witness that a hair specimen found on the clothing of the victim "exhibited the same microscopic characteristics" as head hairs removed from the defendant. The defendant contends that this testimony should have been excluded as "speculative or conjectural" because the witness was unable to state specifically that the hair found on the victim's clothing was that of defendant.

The hair-identification testimony was properly admitted. The weight to be given such evidence is for the trier of fact.

*Brown v. State*, Del.Supr., 329 A.2d 153, 154 (1974).[8]

The issue raised by Thompson is not the weight which hair identification evidence should receive at trial, but the weight which such evidence should be accorded in evaluating probable cause to arrest. The probative value attributable to hair comparisons is placed into perspective by a review of a few of our prior decisions which have commented upon such evidence.[9] It is significant that the results of a comparative hair analysis have been held to be so impor-

tant to the *defense* of a criminal case as to require the reversal of a conviction if access to such information is denied by the State. *Ayres v. State*, Del.Supr., 436 A.2d 800, 802–03 (1981). *See Deberry v. State*, Del.Supr., 457 A.2d 744, 751 & n. 5 (1983); *Fensterer v. State*, Del.Supr., 509 A.2d 1106, 1109–11 (1986).[10]

In *Ayres*, an FBI report contained two negative hair comparisons that were favorable to the defendant in a rape case. 436 A.2d at 802 & n. 1. This Court found that the FBI report constituted *Brady* matter[11] and "was clearly material to the issue of whether intercourse had occurred." *Id.* at 802. Moreover, this Court held that the FBI report was of "sufficient probative value (due to its objective nature) to create a reasonable doubt that may not have otherwise existed as to defendant's guilt." *Id.* at 803. Similarly, in *Deberry*, another rape case, this Court found that the absence of the victim's hair on the defendant's clothing would support the denial of intercourse. 457 A.2d at 751 & n. 5.

In examining evidence of hair analysis from the prosecution's point of view, this Court has concluded that such evidence is sufficient to connect the victim of a rape and the defendant. *Parson v. State*, 222 A.2d at 331.[12] We have also observed that hairs discovered in a discarded ski mask linked the defendant to a robbery. *Buck-*

7. In *People v. Allweiss*, 396 N.E.2d 735 (N.Y. 1979), the defendant appealed his conviction for second degree murder, arguing, among other things, that results of microscopic hair analysis are no more reliable than lie detector evidence and should be inadmissible. The expert testimony was that the defendant's head hair was compared with hair samples from the crime scene. While admitting hair comparisons are not as conclusive as fingerprinting, he stated that an individual could be identified within a reasonable degree of certainty provided sufficient similarities in the hair samples could be found. Finally, the expert testified he was able to do that in this case. Finding the testimony admissible, the court said the testimony was relevant to the defendant's guilt. *Id.* at 740.

8. *See also Dutton v. State*, Del.Supr., 452 A.2d 127, 133 (1982) (testimony by a specialist that hairs were similar was admitted at trial).

9. The value of hair analysis, with its limitations, is recognized by legal scholars. *E.g., McCormick on Evidence* § 207, at 639 (3d (Law.) ed. 1984).

10. In the past, some defendants have challenged the adequacy of police investigations that did not gather hair evidence for comparison. *See, e.g., Thompson v. State*, Del.Supr., 399 A.2d 194, 198 (1979).

11. "*Brady* matter" is evidence favorable to the defendant and material to either guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87–88, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

12. In *Parson*, as in this case, the FBI special agent testified that the head hair taken as evidence and the known sample "were identical in all individual microscopic characteristics." 222 A.2d at 329.

*ingham v. State*, Del.Supr., 482 A.2d 327, 330 (1984).

### Totality of Circumstances: Forensic Hair Analysis/Probable Cause

The validity of Thompson's arrest depends upon:

> whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [Thompson] had committed or was committing an offense.

*Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).[13] In this case, the Superior Court found that there was probable cause for Thompson's warrantless felony arrest. In reaching this conclusion, the trial judge found the fact that Thompson was a suspect in an unrelated but similar incident (i.e., the Royal Oaks case) when coupled with the similarity of the hair comparisons was sufficient to give the police probable cause. Specifically, the trial judge stated that when these two factors were viewed together, "even given the proposition that analysis of hair sampling is certainly not conclusive, since it is a scientific test, it satisfied the test of permitting the police to draw a conclusion based on information somewhere between suspicion and sufficient evidence to convict,"[14] i.e., that probable cause existed for Thompson's arrest.

We are in complete agreement with the reasoning and the ruling by the Superior Court. We conclude that Thompson's identification by virtue of the hair analysis *alone* was insufficient to establish probable cause for a warrantless arrest for the Bowers Street rape. *Cf. Thomas v. State*, 467 A.2d at 956–57. However, the hair analysis was sufficient to connect Thompson to the Bowers Street case. *Parson v. State*, 222 A.2d at 331.[15] We find that the FBI analysis of Thompson's hair was the objective missing link that was necessary to transform the police suspicion that Thompson was connected with the Bowers Street incident into the quantum of information that would lead a man of reasonable caution to conclude that there was probable cause to arrest Thompson for that incident. *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). *Cf. United States v. De Larosa*, 450 F.2d 1057, 1067 (3d Cir.1971), *cert. denied*, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). *See also In re Grand Jury Proceedings: Cecil Mills*, 686 F.2d 135, 140 (3d Cir.), *cert. denied*, 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982).[16]

### Conclusion

The seizure of the tennis shoes that Thompson was wearing and Thompson's line-up identification by the Bowers Street victim were both incident to his lawful, warrantless felony arrest. Therefore, the Superior Court properly denied Thompson's

---

**13.** *Accord Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).

**14.** Supplemental Appendix to Appellant's Opening Brief at A–191, *Thompson v. State*, Del.Supr., No. 92, 1986.

**15.** *See Lampkins v. State*, Del.Supr., 465 A.2d 785, 787 (1983) (hair comparisons by an FBI expert corroborated other testimony).

**16.** In that case, a person was suspected of committing an armed robbery in Wilmington, Delaware. Apparently, the prosecution did not have probable cause for arrest. The grand jury that

was investigating the robbery issued a subpoena for the suspect to submit a hair sample for the purpose of comparing it to hairs found on a ski mask at the crime scene. *In re Grand Jury Proceedings: Cecil Mills*, 686 F.2d 135, 136 (3d Cir.), *cert. denied*, 459 U.S. 1020, 103 S.Ct. 386, 74 L.Ed.2d 517 (1982). The United States Court of Appeals for the Third Circuit ordered the suspect to submit the hair sample, noting that: "A snip of hair is often adequate for identification purposes." *Id.* at 140 (citing Imwinkelried, *Forensic Hair Analysis: The Case Against the Underemployment of Scientific Evidence*, 39 Wash. & Lee L.Rev. 41, 53–58 (1982)).

The Third Circuit gave the clear impression that a positive hair comparison might be the exact quantum of evidence necessary to elevate the unarticulated suspicion into probable cause to arrest. *See id.*

Motion to Suppress that evidence. The Superior Court's judgments of conviction against Thompson are AFFIRMED.