Rashid ROY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 505, 2011.

Supreme Court of Delaware.

Submitted: Sept. 19, 2012.
Decided: Dec. 12, 2012.

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware, for appellant.

James J. Kriner, Esquire (Argued), James T. Wakley, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

This is the defendant-appellant's, Rashid Roy's ("Roy"), direct appeal from his judgments of conviction, after a Superior Court jury trial, of Murder in the First Degree, Possession of a Deadly Weapon by a Person Prohibited, Assault in the Third Degree, and Terroristic Threatening. Roy raises two issues. First, Roy contends that the police lacked the articulable suspicion that was necessary to detain him for an investigatory stop and, thereafter, lacked probable cause to arrest him. Therefore, Roy argues that evidence derived from those illegal activities should have been suppressed by the Superior Court. Second, Roy argues that even though he stipulated to the introduction of his drug usage at trial, the State erroneously failed to connect that drug usage to any of the purposes permitted by the Delaware Rules of Evidence.

We have concluded that both of Roy's arguments are without merit. First, although Roy's initial detention and subsequent arrest were both illegal, the evidence seized during those actions would inevitably have been discovered through proper police procedures and was therefore admissible at his trial. Accordingly, the motion to suppress was properly denied. Second, Roy did not object to the manner in which the State presented evidence of his drug usage at trial. Because the record does not reflect plain error, Roy's second claim on appeal has been waived. Accordingly, the Superior Court's judgments of conviction must be affirmed.

### Facts

On February 17, 2010, at about 5:00 a.m., Alvin Pauls ("Pauls") was getting dressed inside his apartment at the Compton Apartments complex when he heard a scream. Approximately ten minutes later, Pauls left his apartment and went onto Seventh Street in Wilmington.

Pauls heard a male voice call out to him, "who are you?" from across the street. As Pauls turned to the direction of the sound, he saw a man standing over a second person who was lying in the street. Pauls went to his automobile and called 911. Pauls told the 911 operator that he believed he heard a woman screaming and had seen a man standing over a body in the street.

At 5:17 a.m., a dispatch went out directing City of Wilmington police officers to respond to an assault in progress at the intersection of Seventh and Walnut Streets. Wilmington Police Lieutenant Matthew Kurten ("Lt. Kurten"), in full uniform but driving a discreetly marked Ford Crown Victoria, was the first officer to reach the scene. Lt. Kurten saw only one person on the darkened street—a male later identified to be Roy—wearing a camouflage coat and walking on the sidewalk near St. Michael's Day Care. At approximately 5:19 a.m., Lt. Kurten radioed the police dispatch center about Roy and pulled his car up next to him. Roy abruptly put his hand up against his face, obscuring the officer's view, and began walking in the opposite direction.

As Lt. Kurten began to back his car up to follow Roy, he saw two fully-marked patrol cars pull onto the block from the direction where Roy was walking. The first of those marked vehicles was driven by Officer Patrick Bartolo ("Officer Bartolo"). Officer Bartolo, who had heard Lt. Kurten's earlier radio transmission, exited his car, walked toward Roy, and asked Roy to approach his cruiser. When Roy hesitated, Officer Bartolo placed his hand

on Roy and guided him toward the police car.

As Officer Bartolo and Roy were approaching the police vehicle, Wilmington Police Officers Timothy O'Connor and Jamaine Crawford arrived and placed Roy in handcuffs. Officer Crawford asked Roy if he had any weapons in his possession. Roy responded that he had a knife. Officer O'Connor then took a hat from Roy's hand and discovered a knife inside the hat. After Officer O'Connor removed his hands from Roy's clothing, he noticed that they were slippery.

When Officer O'Connor shined a flashlight on his own hands, he noticed that his hands were covered in blood. The light revealed that Roy's hands were also bloody. At the same time this was happening, another officer radioed that she had found an unconscious black male—the victim, Davelle Neal. Roy was then placed in Officer Bartolo's patrol car and transported to the police station.

In later statements made to the police, Roy maintained that he and Neal had been robbed by unknown individuals who fled in an unknown car in an unknown direction. Roy claims to have wrestled the knife away from the assailants, wrapped it in a scarf, and put it in his hat. Roy also told the police that he dragged Neal out of the street to help him.

The clothing that Roy was wearing on the night of the incident was subjected to forensic analysis. Testing revealed that the blood on Roy's clothes and on the knife was consistent with the blood of Neal. At trial, a blood spatter analyst opined that the stains found on Roy's clothing and in the vicinity of Neal's body were inconsistent with Roy's statements and were more consistent with Roy and Neal engaging in

a struggle. The police later obtained a video of the crime from motion-activated cameras. Based on the clothing he was wearing that night, Roy was identified in the video as the one who killed Neal.

On May 24, 2010, Roy was indicted on charges of Murder First Degree, Possession of a Deadly Weapon During the Commission of a Felony, Possession of a Deadly Weapon by a Person Prohibited, Assault Third Degree, and Terroristic Threatening. Roy filed a motion to suppress evidence obtained by the police as a result of an unlawful investigatory stop and arrest. After a hearing, the Superior Court denied the motion in a bench ruling.

The State filed a motion *in limine* to introduce evidence of Roy's drug usage and dealing the day before the murder. The parties later stipulated that the State could introduce evidence of Roy's drug usage but not of drug dealing. Roy now claims that despite the stipulation regarding his drug usage, at trial, the State failed to connect the evidence to any proper purpose.

Following a jury trial, Roy was convicted of all charges, except Possession of a Deadly Weapon by a Person Prohibited. Roy was subsequently sentenced to life imprisonment on the Murder First Degree conviction, and to an aggregate of twelve years imprisonment, suspended after eleven years for a period of probation, on the remaining charges.

### Roy's Detention and Arrest

Roy's first contention on appeal is that he was unlawfully detained in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 6 of the Delaware Constitution.[1] Roy filed a motion to suppress the evidence discover-

---

1. Since we have concluded that Roy's detention violated the United States Constitution, it is unnecessary to address his argument under the Delaware Constitution.

ed after a search of his person. According to Roy, that evidence was inadmissible due to his initial unlawful detention and subsequent illegal arrest. Roy contends that the police did not have reasonable, articulable suspicion necessary to justify an investigatory detention. Roy further contends that the police lacked the requisite probable cause to arrest him. Roy maintains that regardless of whether the seizure followed an illegal detention or an illegal arrest, any evidence derived from the seizure must be suppressed as the fruit of such alleged activity.

■ Roy first challenges his initial detention by the police. He argues that when Officer Bartolo summoned Roy to his cruiser, and later told Roy that he was not free to leave, he (Roy) was detained. According to Roy, he was *at least* subject to a stop and frisk at that time without the requisite level of articulable suspicion.[2] Roy asserts that he was unlawfully arrested at the moment he was placed in handcuffs.[3]

### Standard of Review

■ When reviewing a denial of a motion to suppress evidence, this Court reviews the trial court's legal conclusions *de novo.*[4] When reviewing the trial court's factual findings, this Court determines whether the trial court abused its discretion in deciding whether there was suffi-

cient evidence to support the findings and whether those findings were clearly erroneous.[5]

### *Initial Detention Illegal*

■ To conduct an investigatory stop, an officer must have reasonable suspicion that the individual detained is engaged in or is about to be engaged in criminal activity.[6] "The reasonableness of [the officer]'s suspicion must rest on the facts known to him at the time he ordered [the suspect] to stop."[7] In this case, the defense acknowledges that when Officer Bartolo summoned Roy, the officer had reasonable suspicion that a crime was committed near St. Michael's Day Care. Roy submits, however, that Officer Bartolo had no information that constituted a reasonable articulable suspicion that connected Roy to any criminal activity. Roy argues that Officer Bartolo only had "an inchoate and unparticularized suspicion or hunch."[8]

The record supports Roy's assertions. The police had no information about the alleged assailant other than the fact that he was a male. The police had no idea of his race; no idea of his height; no idea of his weight; no idea of the color of his hair or eyes; no idea of what he was wearing; and no idea whether or in which direction he may have fled the scene.

When Lt. Kurten saw Roy, he did not detect anything unusual in his appearance

2. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. Police may only conduct a warrantless arrest when a crime has been committed in their presence, or where they have "reasonable ground to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." Del.Code Ann. tit. 11, § 1904(b)(1). A "reasonable ground to believe" must be more than mere suspicion, which this Court has construed to mean probable cause. *Thompson v. State*, 539 A.2d 1052, 1055 (Del.1988).

4. *Lopez–Vazquez v. State*, 956 A.2d 1280, 1285 (Del.2008).

5. *Id.*

6. *See Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. 1868.

7. *Jones v. State*, 745 A.2d 856, 863 (Del.1999).

8. *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

or conduct. Lt. Kurten did state it appeared to him that Roy attempted to conceal his identity before walking away from Lt. Kurten's car. Seconds later, however, Roy saw two clearly-marked police cars but made no effort to conceal his identification or avoid contact.

Officer Bartolo did not see any furtive gestures, weapons, or blood. Nevertheless, he and two other officers handcuffed Roy, placed him on the hood of a police car, and searched him. Before seizing Roy, Officer Bartolo did not ask Roy for his name, address, business abroad, or any other information.

■ The only source of information provided to the police regarding the crime and any possible suspect was a 911 telephone tip from a citizen. To determine whether a telephone tip from a citizen can form the basis of an investigatory detention or arrest, the court must consider: "(1) the specificity of the ... tip; (2) independent police corroboration of the facts underlying the tip; and (3) the ability of the tipster to predict future behavior by the suspect."[9] In this case, the citizen caller provided no specifics about the suspect and did not predict any future behavior. Accordingly, the tip did not provide the police with a basis to detain or arrest Roy.

The police had no other facts beyond the uncorroborated information in the tip to support a finding of reasonable suspicion or probable cause that Roy committed a crime. The only facts they possessed regarding Roy were his presence early in the morning and several minutes after the unconfirmed crime. While these facts could be considered in analyzing the totality of the circumstances, this Court has concluded that the time of day and nature of the neighborhood cannot be the sole basis to justify a stop.[10]

The record reflects simply that the police detained Roy because he was the first male they saw near the reported crime scene. In *Jones v. State*, this Court held that a defendant's close proximity to the subject area of the 911 report, and the fact that the alleged events took place at night in a high crime area, were insufficient to establish reasonable suspicion justifying a stop, even though the defendant matched the general description from the 911 report.[11] In *Lopez–Vazquez v. State*,[12] this Court held that there was an insufficient basis to detain the defendant who was within the vicinity of the target area of an investigation, who was seen going into the same building where a drug transaction took place, and who then stopped outside of the building.[13] In *Bradley v. State*,[14] this Court held that the observation, shortly after midnight, of an idling occupied vehicle with its lights off, in front of a vacant house in an "open air drug market," did not constitute a reasonable articulable basis for suspecting criminal activity to justify seizing the defendant.[15]

We have concluded Roy's assertions that he was illegally detained are supported by the record. Nevertheless, we hold that any evidence derived from the unlawful

9. *Jones v. State*, 745 A.2d at 870 (citing *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

10. *Id.* at 871.

11. *Id.*

12. *Lopez–Vazquez v. State*, 956 A.2d 1280 (Del.2008).

13. *Id.* at 1290.

14. *Bradley v. State*, 976 A.2d 170, 2009 WL 2244455 (Del.2009).

15. *Id.* at *5.

police detention would have been inevitably discovered through routine and legitimate police conduct. Therefore, that evidence was admissible at Roy's trial.

### Inevitable Discovery Doctrine

 It is well established that, generally, evidence illegally obtained must be excluded from the evidence at trial.[16] Similarly, incriminating evidence derived from illegal police conduct—termed the "fruit of the poisonous tree"—must also be excluded.[17] The exclusionary sanction applies to any evidence obtained as a result of a constitutional violation: physical evidence, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention.[18] The United States Supreme Court has recognized, however, that exceptions apply to these rules of constitutional exclusion. One of those exceptions is the inevitable discovery doctrine.

 The inevitable discovery doctrine was first applied by this Court in *Cook v. State*.[19] The exception provides that evidence obtained in the course of illegal police conduct will not be suppressed so long as the prosecution can prove that the evidence "would have been discovered through legitimate means in the absence of official misconduct."[20] One of the rationales for the exclusionary rule—deterrence of police misconduct—is of diminished concern when the police can demonstrate that they would have inevitably discovered the same evidence through lawful conduct.

In *Cook v. State*, the defendant argued for the exclusion of certain evidence because the police lacked the requisite articulable suspicion to perform a *Terry* stop and frisk that resulted in the discovery of stolen currency.[21] In *Cook*, this Court held that "[a]ssuming, however, that seizure of the currency exceeded the scope of a reasonable search for weapons, we find that the evidence is admissible under the "inevitable discovery" exception to the exclusionary rules."[22] Also instructive is *Thomas v. State*.[23] There, a police officer approached a group of several men who all matched the description of a suspected drug dealer and performed a pat down search of the defendant.[24] This Court held that in addition to probable cause and reasonable suspicion existing to search Thomas, the inevitable discovery doctrine also applied, notwithstanding any possible constitutional violation.[25]

Our holding in *Thomas* necessarily concluded that the inevitable discovery doctrine was applicable in the context of both unlawful seizures—*Terry* stops—and unlawful arrests. Therefore, it is not necessary for us to determine at what moment Roy's initial illegal detention became an illegal arrest. In this case, the inevitable discovery doctrine would apply to either a violation of *Terry* or to an unlawful arrest.

16. *Weeks v. United States,* 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

17. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

18. *United States v. Crews,* 445 U.S. 463, 470, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (internal citations omitted).

19. *Cook v. State,* 374 A.2d 264 (Del.1977).

20. *Id.* at 267–68.

21. *Id.* at 267.

22. *Id.*

23. *Thomas v. State,* 8 A.3d 1195 (Del.2010).

24. *Id.* at 1197.

25. *Id.* at 1197–99.

■ The record reflects that the physical evidence obtained from Roy would have been inevitably discovered in the course of routine, proper police conduct. The police were alerted to a potential assault in progress sometime after 5:00 a.m. Lt. Kurten received a dispatch to Seventh and Walnut Streets in Wilmington at 5:17 a.m. By 5:19 a.m., less than three minutes after being dispatched to that intersection, Lt. Kurten noticed a man—later determined to be Roy—walking away from the scene. Lt. Kurten responded with a dispatch that alerted the police that a man was near the scene of a suspected crime. After Roy noticed Lt. Kurten's car, he turned to go in a different direction while covering his face.

As Roy walked away from Lt. Kurten, he was met by two additional responding police vehicles. This time, Roy did not make any evasive maneuvers. Nevertheless, Officers Bartolo, Crawford, and O'Connor detained Roy. First, Officer Bartolo placed his hands on Roy to escort him near his patrol car, and then Officers Crawford and O'Connor placed Roy in handcuffs and searched his hat. At the same time this was happening, another police officer reported by radio that the victim's body had been discovered. This all happened within minutes of the first dispatch to police, at 5:17 a.m., to investigate a crime in progress.

The record reflects the Wilmington police officers immediately responded to a report that a violent crime was in progress or had just taken place. Roy was the only person near the crime scene. The record further reflects that after Lt. Kurten saw Roy, the police did not intend to let Roy out of their sight. Within only a very few minutes after seeing Roy, while Roy would still have been under police observation as the only male in the area, the victim's body was discovered.

When the victim's body was discovered, the police would have been justified in legally detaining Roy for investigatory purposes. Due to the violent nature of the crime, the police could have properly performed a pat down search of Roy's clothing for weapons. This pat down search would have undoubtedly included Roy's hat, which contained the murder weapon. The proper investigatory detention would also have lead to the discovery of the blood on Roy's hands and clothing. The results of Roy's legal investigatory detention, after the victim's body was discovered, would have led to Roy's legal arrest.

In *Cook v. State*, we applied the inevitable discovery rule to facts that are similar to those here. We stated:

> The majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery. In general, where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency involved would have led to the discovery of the questioned evidence, the exception will be applied to prevent its suppression.[26]

Accordingly, we hold that the Superior Court properly denied Roy's motion to suppress because the physical evidence discovered during Roy's illegal detention would have been inevitably discovered through proper police conduct after the victim's body was discovered.

**26.** *Cook v. State,* 374 A.2d at 268.

### Roy's Drug Usage and Dealing

Roy next argues that the State's introduction of his drug usage at trial was improper because that evidence was not connected to any proper purpose under the Delaware Rules of Evidence. In a motion *in limine,* the State sought to introduce evidence at trial of Roy's drug dealing and drug usage. In support of the motion, the State claimed that the evidence was inextricably intertwined with other evidence that was necessary to place the alleged crimes in context. Prior to trial, the parties stipulated that the State would not introduce evidence of drug dealing but would be permitted to introduce evidence of Roy's drug usage.

Despite that pretrial stipulation, Roy now argues that the State failed to connect his drug usage to the crimes. According to Roy, the evidence of his drug usage is not "material to an issue or ultimate fact in dispute." [27] Roy also argues that his drug usage is not admissible for any of the permitted purposes under Rule 404(b) of the Delaware Rules of Evidence: motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

### No Plain Error

Roy stipulated to the introduction of his drug usage at trial. Assuming, *arguendo,* that the State failed to link the evidence of Roy's drug use to the murder, Roy did not object to that evidence at trial. Because Roy now challenges the drug usage evidence for the first time on appeal, our review is limited to plain error. [28]

"[T]he doctrine of plain error is limited to material defects that are apparent on the face of the record, are basic, serious, and fundamental in their character, and clearly deprive an accused of a substantial right, or clearly show manifest injustice." [29] "To be plain, the alleged error must affect substantial rights, generally meaning that it must have affected the outcome of [Roy's] trial." [30] When an error is not challenged at trial, it "must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." [31]

In *Wilson v. Williams,* [32] an inmate filed a lawsuit claiming assault by a prison guard. The trial judge ruled the jury could be told that the inmate was incarcerated for killing a police officer. That limited ruling did not give the prison guard's attorney permission to describe the inmate as a "cop killer," to describe the details of that crime, to seek sympathy for the victims, or to imply that inmates who commit such offenses are "fair game in prison"— all of which the prison guard's attorney argued to the jury without objection. [33] Nevertheless, *Wilson v. Williams* held that evidence ruled admissible for one purpose, but misused for a second purpose, cannot be argued as error on appeal without a specific objection. [34]

In this case, Roy stipulated that the State could present evidence to the jury of

---

27. *Getz v. State,* 538 A.2d 726, 734 (Del.1988).

28. *See Wilson v. State,* 950 A.2d 634, 641 (Del.2008); Del.Supr. Ct. R. 8.

29. *Baker v. State,* 906 A.2d 139, 154 (Del. 2006).

30. *Brown v. State,* 897 A.2d 748, 753 (Del. 2006).

31. *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

32. *Wilson v. Williams,* 182 F.3d 562 (7th Cir. 1999).

33. *Id.* at 565.

34. *See id.* at 568. *See also* D.R.E. 103(a)(1).

his drug use. To the extent that the State presented such evidence at trial in a manner that exceeded the scope of the stipulation, Roy did not object. Without a specific objection at trial, Roy must rely on the doctrine of plain error to argue the misuse of that evidence on appeal.

█ The record reflects no plain error. The State's case against Roy was strong. In addition to the bloody murder weapon (knife) found in Roy's possession minutes after the 911 call, and Roy's bloody clothing, the State introduced into evidence a video of Roy committing the crime. Consequently, any improper references to Roy's drug use would not have affected the outcome of his trial.

### Conclusion

The judgments of the Superior Court are affirmed.