# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,       )
                          )
     v.                )     Case No. 131000634
                          )
DILIP NYALA,          )
                          )
    Defendant.       )

Submitted: June 9, 2014
Decided: July 17, 2014

*Upon Consideration of Defendant's Motion to Suppress –*
Motion **GRANTED**.

# OPINION

Sarita R. Wright, Esquire, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware, Attorney for the State of Delaware.

Patrick J. Collins, Esquire, Wilmington, Delaware, Attorney for the Defendant.

**STREETT, J.**

**Introduction**

Defendant Dilip S. Niyala ("Defendant") has filed a Motion to Suppress all of the evidence obtained as a result of warrantless searches that were conducted on October 1, 2013 of his apartment, an apartment belonging to a third party, and the vehicle that he was operating when he was stopped and seized by police.[1] He argues that the evidence was obtained in violation of the Fourth Amendment of the United States Constitution and Article I, § 6 of the Delaware Constitution.

Defendant also sought to suppress his statement to the police while in custody. However, the State conceded that *Miranda* warnings[2] were not given to the Defendant prior to the custodial interrogation that elicited his statement, and as a result, the State will not offer Defendant's statements into evidence in its case in chief.[3]

A suppression hearing was held on April 25, 2014. Following the hearing, the parties, pursuant to their joint request, submitted supplemental memoranda on the validity of the stop, seizure, and Defendant's consent to search.

For the reasons set forth below, Defendant's Motion to Suppress is granted.

---

[1] Identification, quantity, and weight of substances seized are the subject of a separate hearing as part of an investigation into the procedures and reliability of the Medical Examiner's Office.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] State's Resp., 10 (Apr. 1, 2014).

**Factual & Procedural Background**

On December 9, 2013, Defendant was indicted on the charges of Aggravated Possession of Heroin (5 or more grams), Drug Dealing (3 counts), Aggravated Possession of Cocaine (25 or more grams), Possession of a Firearm by a Person Prohibited, Possession of Ammunition by a Person Prohibited, and Possession of Drug Paraphernalia.

On March 4, 2014, Defendant filed a Motion to Suppress Evidence.

On April 1, 2014, the State filed its response to Defendant's Motion to Suppress.

On April 25, 2014, a hearing on the Motion to Suppress was held. The Court heard testimony from Wilmington Police Department ("WPD") Detective Randolph Pfaff and Drug Enforcement Agency ("DEA") Special Agent Seamus Toolan.

Det. Pfaff was the Chief Investigating Officer of an investigation that took place on October 1, 2013.[4] Det. Pfaff testified that on that date (October 1, 2013), he received information from a past proven and reliable confidential informant (the "CI").[5] At the time that the information was proffered, the CI was in criminal

---

[4] Suppression Hrg. Tr., 25 (Apr. 25, 2014) (hereinafter "Tr. at _____").

[5] *Id.*

3

trouble and had "legal matters" pending.[6]  One prior tip from the CI had led to an arrest.[7]

The CI told Det. Pfaff that a person known as "Chin" (last name Nyala) was in possession of a semi-automatic firearm, a revolver, and had recently received "a large quantity of heroin."[8]  The CI described "Chin's" physical appearance, connected "Chin" to Building D at 2702 Manchester Arms Apartments in Elsmere, and said that "Chin" distributed heroin by driving a silver Nissan Altima to meet buyers.[9]  The CI also told Det. Pfaff that "Chin" "uses" his girlfriend's second floor apartment in the 2700 block of West Fifth Street, Wilmington.[10]  Prior to the CI's tip, Defendant had not been the target of an investigation.[11]

Det. Pfaff testified that he "immediately responded" to Manchester Arms Apartments and observed a 2012 Nissan Altima parked in front of Building D.  He ascertained that the vehicle was registered to Defendant and Defendant's mother.  Det. Pfaff then showed Defendant's driver's license photograph to the CI who positively identified the Defendant as "Chin."[12]

---

[6] Tr. at 44.

[7] Tr. at 26, 43.

[8] Tr. at 25, 26.

[9] Tr. at 25, 39.

[10] Tr. at 26.

[11] Tr. at 43.

[12] Tr. at 27.

4

At that time, Det. Pfaff had Agent Toolan and several members of the WPD Drug Unit establish surveillance on the Altima.[13] Another member of the WPD Drug Unit went to the Manchester Arms Apartments' Leasing Office, obtained a master list of lessees, and ascertained that Defendant was the lessee of Apartment 301 in Building D.[14] Once surveillance was established, Det. Pfaff went to the police station to draft a search warrant for Defendant, Defendant's apartment, and the Nissan Altima.[15] Det. Pfaff intended to present his draft to a Magistrate at J.P. Court #20, but was unable to find an available Magistrate.[16]

Det. Pfaff testified that there were four units and five officers conducting surveillance on the vehicle at the apartment complex.[17] At some point, the officers observed Defendant exit the building, drive off in the Nissan Altima, return a "short time later," enter the building, and "a short time later," exit the building and again drive away.[18] There was no testimony concerning the length of time that the Nissan Altima was under surveillance and the officers did not observe any illegal drug activity occurring while Defendant was in his vehicle.[19]

---

[13] *Id.*

[14] Tr. at 27 – 28.

[15] Tr. at 29, 40.

[16] Tr. at 30.

[17] *Id.*

[18] Tr. at 28.

[19] Tr. at 48.

Det. Pfaff instructed one of the officers to remain at the apartment complex while the other officers followed Defendant in his vehicle.[20] Det. Pfaff testified that the officers' sole objective was to get Defendant into custody.[21] Agent Toolan testified that Det. Pfaff had instructed Agent Toolan and the other surveillance units "to follow the vehicle . . . to further his case."[22]

Both Agent Toolan and Det. Pfaff testified as to the basis for the stop. According to Agent Toolan, mobile surveillance would have continued "until we could get the vehicle stopped . . . . [W]e were looking for a traffic violation to initiate a stop."[23] Det. Pfaff confirmed that he instructed the surveillance units to stop and detain Defendant if they observed a traffic violation.[24] Det. Pfaff's prior testimony at the Preliminary Hearing, that he had officers following and waiting for Defendant to commit a traffic offense in order to take Defendant into custody, further corroborated Agent Toolan's statement.[25]

Agent Toolan further testified that he was located near Union Street in Wilmington when he received radio information that the Nissan Altima was

---

[20] Tr. at 31.

[21] Tr. at 49.

[22] Tr. at 4 – 5.

[23] Tr. at 13 – 14.

[24] Tr. at 32 – 33.

[25] Tr. at 53.

moving near that area.[26]  He positioned his unmarked Pontiac G6 directly behind the Nissan Altima in the vicinity of North Scott Street and followed the vehicle to the area of North Scott and Sixth Streets in Wilmington.[27]  He was aware of "at least three" other police cars that were following the Nissan Altima, including a K-9 car "that was the patrol vehicle behind [Agent Toolan's car]."[28]  There was no testimony concerning the proximity of those other police cars to Defendant's car or what those officers saw.

Agent Toolan then observed that the driver had failed to use a turn signal before making a right turn.  Lacking a siren and lights, Agent Toolan continued through the intersection and contacted the other surveillance units that a traffic violation had been committed.  Agent Toolan received information that a marked police unit would initiate the traffic stop, he continued driving, and "squared the block."[29]

Agent Toolan testified that he did not see the traffic stop occur.[30]  When he returned to North Dupont Street and parked on the south side of the intersection of Sixth and Dupont Streets, he observed (from a distance of approximately 100 feet)

---

[26] Tr. at 5.

[27] Tr. at 5 – 6.

[28] Tr. at 10, 15.

[29] Tr. at 6 – 7.

[30] Tr. at 7.

7

that Defendant was in the process of being handcuffed and taken into police custody.[31]  Agent Toolan left the area and went to the police station.[32]

No officer testified as to the vehicle stop and initial detention of Defendant. There was no testimony concerning whether guns were drawn, a police dog was involved, or whether *Miranda* warnings were given to Defendant.  Det. Pfaff only testified that Sgt. Rodriguez, who was in the marked K-9 car, placed Defendant into custody without incident, handcuffed Defendant, and transported Defendant to the station.[33]

The Nissan Altima did not have any contraband in plain view.[34]  It was transported to the station.  Det. Pfaff confirmed that no traffic citation was ever issued to Defendant and that none of the officers completed supplemental police reports.[35]

Det. Pfaff explained that Defendant was stopped based on the traffic violation and the report of drugs and firearms.[36]  Initially, Det. Pfaff testified that there was a "logistical issue trying to get a marked unit to do the stop."[37]  He later

---

[31] Tr. at 7, 12.

[32] Tr. at 7.

[33] Tr. at 33, 59.

[34] Tr. at 68.

[35] Tr. at 48 – 49, 61.

[36] Tr. at 70.

[37] Tr. at 49.

8

explained that, although he was concerned that Defendant might have two guns in his possession, Defendant's detention could not occur near Defendant's apartment because Det. Pfaff did not "know who could be in the apartment, what other threat there might be," and the surveillance team was undercover.[38] Det. Pfaff stated that "[D]efendant would have been stopped because of the firearms and our concern" and that "ultimately the [felony] stop would have been conducted."[39] However, Det. Pfaff also admitted, on cross-examination, that he had previously testified that the stop was to detain Defendant while Det. Pfaff waited to find a Magistrate to sign the search warrant.[40]

Meanwhile, Det. Pfaff was still at the police station attempting to find a Magistrate to approve and sign the search warrants that he drafted.[41] He did not witness the traffic stop or the initial detention.[42] Det. Pfaff knew "several of the officers that were at the stop" but he did not "know all of the officers."[43] He stated that the Defendant was placed in handcuffs because there was "information about

[38] Tr. at 49, 54.

[39] Tr. at 50, 51.

[40] Tr. at 52 – 53.

[41] Tr. at 33.

[42] Tr. at 58.

[43] Tr. at 61.

possession of firearms, the possibility of flight."[44] The search warrants that Det. Pfaff drafted were never shown to or approved by a Magistrate.[45]

Upon receiving information that the police had taken Defendant into custody, Det. Pfaff remained in the turnkey cell area to wait for Defendant to be brought to the station.[46] Det. Pfaff described Defendant as "cooperative, respectful" upon his arrival in the turnkey.[47] Det. Pfaff initiated questioning of Defendant within "a minute or two."[48] The State concedes that *Miranda* warnings were not given when Det. Pfaff initiated the questioning. Det. Pfaff testified that his primary goal in making initial contact with Defendant was to get Defendant to cooperate with separate investigations.[49]

Agent Toolan met with Det. Pfaff as Det. Pfaff began to speak with Defendant.[50] Agent Toolan did not remain.[51] Det. Pfaff and Agent Toolan were

---

[44] Tr. at 58 – 59.

[45] Tr. at 40 – 42. *See also* State's Resp. at ¶ 29 (arguing that the evidence seized from Defendant's apartment and vehicle is admissible because Det. Pfaff had "already faxed the [draft] search warrant for the [D]efendant's residence and car before he obtained consent from the [D]efendant").

[46] Tr. at 34.

[47] *Id.*

[48] Tr. at 62.

[49] Tr. at 70.

[50] Tr. at 7 – 8.

[51] Tr. at 8.

unable to recall if Defendant was handcuffed to his seat but both testified that Defendant was not free to leave.[52]

Det. Pfaff described Defendant's demeanor as "cooperative" and "a gentleman."[53] Defendant was not belligerent or disrespectful. Det. Pfaff testified that Defendant provided Det. Pfaff with information "regarding the gun, drugs, and the locations where they were concealed."[54] However, Det. Pfaff confirmed that, at some point, Defendant "was becoming indecisive" and had concern for the wellbeing of his son and Cherise Rivera (the lessee of the Wilmington apartment).[55] Det. Pfaff stopped the interview and started removing Defendant's property. Defendant then told Det. Pfaff that "he wanted to cooperate and the interview continued."[56]

Det. Pfaff, apparently abandoning his efforts to find a Magistrate to approve the draft search warrant, had Defendant sign an "authorization to search form" for 2702 Eastwood Rd., D-301, Elsmere (Defendant's apartment) and the 2012 Nissan Altima. He also signed a second form for 2703 West Fifth Street, Second Floor Apartment, Wilmington (Ms. Rivera's apartment and for which Defendant

---

[52] Tr. at 62.

[53] Tr. at 64.

[54] *Id.*

[55] Tr. at 64, 69.

[56] Tr. at 64.

11

possessed a key).[57] Once the forms were obtained, the officers conducted searches of Defendant's apartment, Ms. Rivera's residence, and the Nissan Altima.

The police searched Defendant's apartment first and recovered $4,090.00 from a safe. The police then searched Ms. Rivera's residence and located 856 bags (17.14 grams) of heroin, 48 grams of crack cocaine, 66 grams of marijuana, two digital scales, and a glass Pyrex dish with white powder residue in a kitchen cabinet. They also located a Ruger 9mm semiautomatic handgun in a closet by the master bedroom. A search of the Nissan Altima revealed $150.00 and 130 bags (2.6 grams) of heroin concealed behind the plastic in the center console.[58]

Det. Pfaff also testified that he interviewed Ms. Rivera a few days later.[59] Although the CI had identified Ms. Rivera as Defendant's girlfriend, Det. Pfaff "understood that [Ms. Rivera and the Defendant] were . . . not technically in a relationship."[60] While Ms. Rivera confirmed that Defendant had a key and access to the West Fifth Street apartment, Det. Pfaff did not know whether Defendant was ever an overnight guest and it is unclear why the detective believed that Defendant and Ms. Rivera were sexually intimate.

---

[57] Tr. at 34 – 35.

[58] Tr. at 37 – 38.

[59] Tr. at 66.

[60] Tr. at 67.

12

At the end of the hearing, defense counsel suggested, and the State agreed, to review the hearing transcript and simultaneously submit supplemental memoranda. The parties filed their supplemental memoranda on June 9, 2014.

**Parties' Contentions**

Defendant contends that he was unlawfully seized in violation of his Fourth Amendment rights because the officers who executed the stop lacked reasonable articulable suspicion and, as a result, all of the evidence derived thereafter must be suppressed under the exclusionary rule. He further contends that the stop violated his rights under Article I, § 6 of the Delaware Constitution.

The State asserts that the stop and seizure were justified by probable cause to believe that Defendant had committed a traffic violation, based on Agent Toolan's observation that Defendant had failed to use a turn signal, and that Defendant was lawfully seized in accordance with 21 *Del. C.* § 701, which authorizes a warrantless arrest for a motor vehicle violation. The State also asserts that the traffic stop was used as a "law enforcement tool to ensure [the officers'] safety" because "they were about to stop a suspect who allegedly carried . . . two firearms."[61] The State argues that the officers' subjective intent is irrelevant.

In addition, the parties dispute the validity of Defendant's consent to search his apartment, Ms. Rivera's apartment, and the Nissan Altima.

---

[61] State's Supp. Br., 2 & n. 3 (June 9, 2014).

## Standard of Review

On a motion to suppress, the defendant bears the burden of establishing that the challenged search or seizure violated his rights under the United States Constitution, the Delaware Constitution, or the Delaware Code.[62] If the defendant establishes a basis for the motion, the State must then prove, by a preponderance of the evidence, that the actions of its agents were in accordance with constitutional protections.[63] As the trier of fact at a suppression hearing, the judge determines the credibility of witnesses.[64]

## Discussion

The Fourth Amendment of the United States Constitution[65] and Article I, § 6 of the Delaware Constitution[66] protect individuals from unreasonable searches and seizures.

When a police officer conducts a traffic stop of a vehicle, the occupants and the vehicle are seized under the Fourth Amendment, so the stop "is subject to

---

[62] *State v. Dollard*, 788 A.2d 1283, 1286 (Del. Super. 2001).

[63] *State v. Babb*, 2012 WL 2152080, *2 (Del. Super. June 13, 2012).

[64] *State v. Brinkley*, 2013 WL 1225869, *2 (Del. Super. Feb. 19, 2013).

[65] *See* U.S. CONST., amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated").

[66] *See* Del. Const., art. I, § 6 ("The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures").

constitutional limitations."[67]  The State is required to prove that "the stop and any subsequent police investigation were reasonable in the circumstances."[68]  A stop is reasonable when it is supported by probable cause to believe that a traffic code violation has occurred or that there is reasonable articulable suspicion that criminal activity is afoot.[69]

In the instant case, the officer (or officers) who initiated the stop lacked probable cause to stop Defendant for a traffic code violation.

Probable cause to conduct a traffic stop exists "as long as the officer is making the traffic stop based on a violation of the traffic code that *he has observed*."[70]  Here, the only testimony presented about the traffic stop was that Agent Toolan was the only officer who observed a traffic code violation and did

---

[67] *Caldwell v. State*, 780 A.2d 1037, 1045 – 46 (Del. 2001).  *See also Tann v. State*, 21 A.3d 23, 26 (Del. 2011) (citing *Caldwell v. State*, 780 A.2d at 1045).

[68] *Caldwell v. State*, 780 A.2d at 1046.

[69] *State v. Rickards*, 2 A.3d 147, 151 (Del. Super. 2010), *aff'd*, 2011 WL 153643 (Del. Jan. 12, 2011).  *See also* 11 *Del. C.* § 1902(a) ("A peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand the person's name, address, business abroad and destination"); *McDonald v. State*, 947 A.2d 1073, 1077 (Del. 2008) ("As a general matter, the decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred") (internal quotation marks omitted) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)).

[70] *State v. Rickards*, 2 A.3d at 152 (emphasis supplied).  *See also Holden v. State,* 23 A.3d 843, 847 (Del. 2011) ("A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver") (citing *Whren v. United States*, 517 U.S. at 810); *Yuskiewicz v. State*, 2011 WL 798136, *2 (Del. Mar. 4, 2011) (finding a traffic stop justified where the officer "personally observed" the defendant's traffic violations); *McDonald v. State*, 947 A.2d 1078 (noting that "where police officers are required to act upon actual traffic violations that they observe, it will provide 'the quantum of individualized suspicion that is necessary to ensure the police discretion is sufficiently constrained'") (quoting *Whren v. United States*, 517 U.S. at 817 – 18); *Lewis v. State*, 2010 WL 4869110, *2 (Del. Nov. 24, 2010) (finding valid traffic stop after an officer in an unmarked police car observed a driver commit a traffic violation and 10-12 blocks later, having called for assistance, stopped the vehicle and informed the driver of the basis for the stop); *State v. Darling*, 2007 WL 1784185, *4 (Del. Super. July 3, 2007) ("When an officer observes a clear violation of the law (even a minor violation), the officer must respond to, and take appropriate action concerning, the violation in order to avoid being negligent in the carrying out of the officer's duties").

15

not execute the stop. There is no evidence that the officer(s) who stopped the Defendant's vehicle had personally observed a traffic code violation and testimony revealed that the officer(s) who executed the traffic stop did not create any supplemental reports.[71]

Although Agent Toolan observed the Nissan Altima's driver fail to use a turn signal before making a right turn in violation of 21 *Del. C.* § 4155[72], he did not follow the Nissan Altima or initiate or otherwise participate in the stop. Instead, he continued through the intersection and contacted other mobile surveillance units. He was informed that a marked unit would conduct the stop, however he did not see the stop occur and did not testify that the officer(s) in the marked unit had observed the driver of the Nissan Altima commit a traffic violation. Agent Toolan essentially detached himself from any stop, "squared" the block, and remained in his unmarked car 100 feet away from the scene as he watched other officer(s) put Defendant in a police car. The stop was not a valid traffic stop.

Moreover, even if the initial stop for a traffic code violation was arguably valid based on Agent Toolan's observation that Defendant failed to use a turn

---

[71] Based on the testimony at the suppression hearing, the mobile surveillance team was comprised of at least three units and four officers (excluding Agent Toolan in his unmarked Pontiac G6), all of whom were following the Nissan Altima. However, it is unclear whether all four of the officers initiated the stop or if the stop was initiated by Sgt. Rodriguez, who was apparently the only officer driving a marked police car.

[72] *See* 21 *Del. C.* § 4155(a) (providing, in relevant part, that: "[n]o person shall so turn any vehicle without giving an appropriate signal . . .").

signal and that Defendant was the person placed in handcuffs, Defendant's detention pursuant to the stop was unreasonably extended. A person who is stopped for a traffic violation may be detained "no longer than is necessary to effectuate the purpose of the stop."[73] Under Delaware law, "[t]he duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop."[74] During the stop, the officer may request identification, ask the occupant to step outside of the vehicle, and run a background check.[75]

Here, the officers clearly knew Defendant's identity through his previously obtained driver's license and registration. There is no evidence other than the fact he was handcuffed and placed in a police car.

While a police officer is permitted to detain a person who has been stopped in accordance with 11 *Del. C.* § 1902 for further questioning and investigation, the law is clear that "an officer's observation of a traffic violation 'does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights.'"[76]

Consequently, an officer who stops a person for a traffic code violation is not entitled to conduct an unrelated criminal investigation "absent some other

---

[73] *Murray v. State*, 45 A.3d 670, 674 (Del. 2012) (internal quotation marks omitted) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)); *State v. Brinkley*, 2013 WL 1225869 at *3; *State v. Babb*, 2012 WL 2152080 at *2.

[74] *Caldwell v. State*, 780 A.2d at 1047.

[75] *Stafford v. State*, 59 A.3d 1223, 1227 (Del. 2012).

[76] *Caldwell v. State*, 780 A.2d at 1048 (internal quotation marks and citation omitted).

17

criminal suspicion."[77] This is so because "any investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by additional facts sufficient to justify the additional intrusion."[78]

Although the subjective motivation of a police officer is irrelevant in determining whether a search or seizure is valid under the Fourth Amendment[79], the officer must have reasonable articulable suspicion that the individual "has committed, is committing, or is about to commit some other crime" in order to further detain an individual driver or occupant on a matter unrelated to the initial stop.[80] The Court will consider such factors as whether the defendant left the scene when the officer was sighted or as the officer approached, the defendant's refusal to cooperate with the officer who initiates the stop, the defendant's presence in a high crime area, the defendant's unprovoked flight, a bulge on his person that appears to be a gun or large quantity of drugs, and a "furtive gesture" upon the officer's approach or display of authority.[81]

---

[77] *Jenkins v. State*, 970 A.2d 154, 158 (Del. 2009).

[78] *Caldwell v. State*, 780 A.2d at 1047.

[79] *Whren v. United States*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

[80] *State v. Brinkley*, 2013 WL 1225869 at *3 (citing *State v. Huntley*, 777 A.2d 249, 254 (Del. Super. 2000)).

[81] *Lopez-Vazquez v. State*, 956 A.2d 1280, 1289 (Del. 2008).

Here, none of those factors were presented. There was no testimony that the surveillance units ever observed Defendant in a high crime area, that Defendant had or appeared to have a firearm or drugs on his person or in plain view at the time he was stopped, or that Defendant made a furtive gesture when the officers approached. Moreover, Det. Pfaff conceded that Defendant made no attempt to flee when he was stopped. Based on the evidence presented, Defendant's seizure was unreasonable because he was detained longer than necessary to effectuate a traffic stop.

Furthermore, even though police officers are authorized to *arrest* a person without a warrant "[f]or violations of [Title 21] committed *in their presence*" pursuant to 21 *Del. C.* § 701, there is no evidence in this case that the officer(s) who arrested Defendant did so based on a Title 21 violation that Defendant committed *in their presence*.[82]

Additionally, the State's reliance on *Traylor v. State*[83] to support its assertion that Defendant was lawfully detained is misplaced. In *Traylor*, prior to stopping the defendant for driving while his license was suspended (a Title 21

---

[82] 21 *Del. C.* § 701(a)(1) (emphasis supplied).

> Title 21, § 701 of the Delaware Code states, in pertinent part:
>> (a) The Secretary of Public Safety, the Secretary of Safety and Homeland Security's deputies, Division of Motor Vehicles investigators, State Police, state detectives and other police officers authorized by law to make arrests for violation of the motor vehicle and traffic laws of this State, provided such officers are in uniform or displaying a badge of office or an official police identification folder, may arrest a person without a warrant:
>>> (1) For violations of this title committed in their presence . . . .

[83] *Traylor v. State*, 458 A.2d 1170 (Del. 1983).

offense), three undercover officers observed the defendant in an area known for drug dealing, were aware that the defendant was the subject of pending drug-related charges, conducted surveillance during which they observed five to six suspected drug transactions occur inside of the defendant's car, and contacted police headquarters to determine if the defendant had a valid license or any outstanding warrants. The officers in *Traylor* had probable cause to make a warrantless arrest under Delaware law because they personally observed the defendant commit a Title 21 violation in their presence.

The instant case is factually distinguishable from *Traylor*. There was no testimony that Defendant was observed in an area known for drug dealing. Furthermore, he was not the subject of an investigation prior to the CI's tip and the surveillance units did not observe Defendant engage in any illegal drug activity from the vehicle that he was driving. Although the Delaware Supreme Court recognized the possibility that an officer who lacks probable cause to obtain a search warrant may "use a traffic arrest as a pretext to conduct a search,"[84] here, there is no evidence that the officer(s) personally observed Defendant commit a traffic code violation in their presence or that there was a speed or red light violation (where the arresting officer is working in conjunction with a reading or

---

[84] *Id.* at 1174 (citing 21 *Del. C.* § 703, "Jurisdiction of offenses").

observing officer), the officer(s) lacked probable cause to arrest Defendant for a Title 21 violation.[85]

Lacking a valid traffic stop, Defendant's "stop initially must be justified by a reasonable suspicion of criminal activity."[86] Here, the officer(s) did not have an arrest warrant or a reasonable articulable suspicion of criminal activity to stop Defendant.

Reasonable articulable suspicion requires an officer to have "a particularized and objective basis to suspect criminal activity."[87] The Court applies a totality of the circumstances standard and the facts are viewed "through the eyes of a

---

[85] *See* 21 *Del. C.* § 701, which states, in relevant part:
> (a) The Secretary of Public Safety, the Secretary of Safety and Homeland Security's deputies, Division of Motor Vehicles investigators, State Police, state detectives and other police officers authorized by law to make arrests for violation of the motor vehicle and traffic laws of this State, provided such officers are in uniform or displaying a badge of office or an official police identification folder, may arrest a person without a warrant:
> * * *
> (2) For violations of § 4169 of this title, relating to speed violations, when the speed is determined by radar, electronic devices, electromechanical devices, audio sensor devices, visual sensor devices or aerial spotting, even though the officer making the arrest did not actually observe the radar speed meter or observe the violation from the aircraft, provided such arresting officer is in a position to observe the vehicle being detected and provided that the officer is working in conjunction with the reading or observing officer and is immediately advised of the violation and that the vehicle being apprehended is the vehicle detected; or
> (3) For violations of § 4108(a)(3) of this title relating to red traffic lights, when the violation is determined by personal observation by another law-enforcement officer who communicates the information to the arresting officer by radio or other telecommunications device, provided that the arresting officer is working in conjunction with the observing officer, the arresting officer is immediately advised of the violation and the vehicle being apprehended is the vehicle detected.

[86] *Stafford v. State*, 59 A.3d at 1227.

[87] *Lopez-Vazquez v. State*, 956 A.2d at 1288.

reasonable, trained police officer in the same or similar circumstances, combining objective facts with the officer's subjective interpretation of those facts."[88]

The Delaware Supreme Court has held that "[a]n informant's tip may provide reasonable suspicion for a stop and seizure where the totality of the circumstances, if corroborated, indicates that the information is reliable."[89] The informant's reliability, "the specificity of the informant's tip, and the degree to which the tip is corroborated by independent police surveillance and information" must be considered in determining whether the tip justifies a stop and seizure.[90] It is important that the tip contain "specific facts and conditions" that exist at the time the tip is made and indicate "future actions that are not ordinarily easily predicted."[91] However, if there are no facts to corroborate the alleged illegal *activity*, then the tip itself is an insufficient basis to justify a stop.[92]

In the instant case, although the CI is past proven and reliable, the CI's tip lacked specificity as to the alleged illegal activity. The CI did not provide any

---

[88] *Id.*

[89] *Miller v. State*, 25 A.3d 768, 771 (Del. 2011). *See also Lewis v. State*, 2010 WL 4869110 at *2 ("In assessing whether a tip from a CI is sufficient to create a 'reasonable suspicion' of wrongdoing, the 'totality of the circumstances' must be considered") (quoting *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008)); *Howard v. State*, 2007 WL 2310001, *2 (Del. Aug. 14, 2007) (holding the officers had a reasonable articulable suspicion to stop a vehicle because they received a tip from a reliable source that a man was selling drugs out of a certain vehicle, the vehicle was registered to the person that the CI identified as the man, and the officers observed two transactions that occurred out of the vehicle, including one outside of a residence where neighbors had complained of drug dealing, prior to the stop).

[90] *Miller v. State*, 25 A.3d at 771 – 772.

[91] *Id.* at 772.

[92] *Roy v. State*, 62 A.3d 1183, 1188 (Del. 2012).

detail regarding the buyers, the location(s) and time(s) of distribution, or supply Det. Pfaff with any prediction as to Defendant's future actions. According to the testimony, the tip only indicated that the alleged activity was "recent."

Moreover, the police did not conduct any controlled drug buys[93] and the surveillance units did not observe Defendant engage in any illegal activity. Although Det. Pfaff and the surveillance units corroborated some of the information in the tip (i.e., Defendant's identity, residence, and vehicle), merely observing a person leave his own apartment complex, enter and drive a vehicle registered to him, return a short time later, and then leave again does not support reasonable articulable suspicion that a person identified by a confidential informant had engaged, was engaging, or was about to engage in any illegal activity.[94] Based on the totality of the circumstances, the CI's tip did not provide reasonable articulable suspicion to stop and seize Defendant.

In addition, the police did not have probable cause to arrest Defendant. A police officer is authorized to make a warrantless felony arrest pursuant to 11 *Del. C.* § 1904(b) when the officer has "reasonable grounds" to believe that the person

---

[93] *See* Tr. at 47.

[94] *See U.S. v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007) ("That the police might corroborate a mountain of innocent data, such as a person's identification and whereabouts, does not provide any basis for executing *Terry* stop on that person. If it did, then *Terry* itself would be a dead letter") (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

to be arrested has committed the crime.[95]  Reasonable grounds, in this context, require that the officer have probable cause to arrest.[96]

Although an informant's tip can provide probable cause for a police officer to make a warrantless arrest where the officer believes that the person to be arrested committed a felony[97], the CI's tip in this case did not provide probable cause.  The tip lacked specificity as to the allegation of criminal activity, the officers did not observe Defendant engage in any illegal drug activity, and there was no contraband in plain view in the Nissan Altima.  Under the totality of the circumstances, the police lacked probable cause to arrest Defendant for any crime.

Thus, the State has not met its burden of proving that the stop and seizure of Defendant's person and vehicle were reasonable under the circumstances.  Because the officers lacked probable cause to stop and arrest Defendant for a traffic code violation and they did not have reasonable articulable suspicion or probable cause

---

[95] *Darling v. State*, 768 A.2d 463, 465 – 66 (Del. 2001).  *See also* 11 *Del. C.* § 1904(b), which provides:
> An arrest by a peace officer without a warrant for a felony, whether committed within or without the State, is lawful whenever:
> > (1) The officer has reasonable ground to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed; or
> > (2) A felony has been committed by the person to be arrested although before making the arrest the officer had no reasonable ground to believe the person committed it.

[96] *Darling v. State*, 768 A.2d at 466.

[97] *Cooper v. State*, 2011 WL 6039613, *5 (Del. Dec. 5, 2011) (finding probable cause to seize the defendant from his vehicle where a CI provided information that a police officer already knew based on a prior investigation of the defendant, the CI positively identified the defendant's photograph, the CI contacted the defendant at the officer's request and showed the officer the text message exchange with the defendant to purchase drugs, the CI identified the defendant's vehicle prior to his seizure, and the defendant was seized at the time and from the location as provided in the text message exchange).  *See also Tolson v. State*, 900 A.2d 639, 643 (Del. 2006) (determining there was probable cause to arrest based on an informant's tip that accurately predicted the defendant's behavior).

24

that Defendant engaged in any illegal activity, the stop and seizure violated Defendant's Fourth Amendment rights.[98]

The law is also clear that evidence that is "recovered or derived in violation of the Fourth Amendment may not be introduced at trial for the purpose of proving the defendant's guilt."[99] Consequently, "[w]hen a person is illegally detained before he purports to give consent, his consent may not be sufficient to cleanse the illegal detention's consent."[100] However, "the poisonous taint of an unlawful search and seizure has dissipated when the causal connection between the unlawful police conduct and the acquisition of the challenged evidence becomes sufficiently attenuated."[101]

To determine whether consent is sufficiently attenuated from an unlawful seizure, the Court will consider: "(1) the temporal proximity of the illegality and

---

[98] Although Defendant contends that the stop and detention violated Article I, § 6 of the Delaware Constitution under *State v. Heath*, that decision was not appealed to the Delaware Supreme Court, has not been followed by the Superior Court in subsequent decisions, and the Delaware Supreme Court has not found that Article I, § 6 of the Delaware Constitution affords greater protection than the Fourth Amendment. *See State v. Heath*, 929 A.2d 390 (Del. Super. 2006); *Turner v. State*, 25 A.3d 774, 777 (Del. 2011) (noting that *Heath* "was not appealed, and . . . has not been followed in any other Superior Court decisions). *See also Cohan v. Simmons*, 2011 WL 379309 at *3 (finding "the Delaware Supreme Court has not held that the Delaware Constitution provides greater protection that the Fourth Amendment in circumstances where a police officer conducts a valid traffic stop with an ulterior motive"); *State v. Adams*, 13 A.3d 1162, 1166 (Del. Super. 2008) (declining to follow *Heath* because "[t]here are too many occasions where . . . there was a lawful basis to stop a motor vehicle for a traffic violation which led later to arrests for other kinds of offenses").

[99] *McDonald v. State*, 947 A.2d at 1077.

[100] *Murray v. State*, 45 A.3d at 677.

[101] *Lopez-Vazquez v. State*, 955 A.2d at 1293. *See also Wong Sun v. U.S.*, 371 U.S. 471, 488 (1963) (holding the question in a case where evidence would not have come to light but for the illegal actions of police is whether "the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint").

the acquisition of the evidence to which the instant objection is made; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official conduct."[102] Each of the factors is weighed and "[n]o 'single factor' is dispositive."[103] If the Court finds that the consent to search is not sufficiently attenuated from the unlawful search and seizure, the consent is tainted and, consequently, any evidence derived therefrom is inadmissible.[104]

In the instant case, Defendant signed the "authorization to search" forms after he was unlawfully stopped and seized.[105] The record also shows that "[t]here were no intervening circumstances that would have . . . operated to dissipate the primary taint."[106] Det. Pfaff orchestrated the detention and waited for Defendant to

---

[102] *Id.* (citing *Brown v. Illinois*, 422 U.S. 590, 603 – 604 (1975)).

    *See also U.S. v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010) (considering such factors as an official's careful explanation of a consent form, the defendant's release from custody, the defendant's appearance before a magistrate, and whether the defendant consulted with an attorney in determining the presence of intervening circumstances); *U.S. v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (noting that factors to consider in assessing the purpose and flagrancy of the conduct include whether: "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up'") (quoting *Brown v. Illinois*, 422 U.S. at 605).

[103] *Lopez-Vazquez v. State*, 955 A.2d at 1293 (quoting *Brown v. Illinois*, 422 U.S. at 603).

[104] *Id.* at 1291.

[105] *See U.S. v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005) (holding the unlawful seizure of defendant in his home based on an anonymous, uncorroborated tip was ongoing when the defendant gave oral consent, "foreclosing the possibility that the consent was sufficiently attenuated from the unlawful conduct as to purge the taint"); *U.S. v. Washington*, 490 F.3d 765, 777 (9th Cir. 2007) (suppressing firearm recovered from the defendant's vehicle where the defendant's consent to search his vehicle was given during his illegal seizure).

[106] *Lopez-Vazquez v. State*, 955 A.2d at 1293. *Compare U.S. v. Martinez*, 486 F.3d at 865 (suppressing evidence seized from the defendant's girlfriend's home where there were "no intervening circumstances of any kind" between the illegal stop based on an anonymous, uncorroborated tip that the defendant possessed weapons used in a homicide and the defendant's consent to search which was obtained as the defendant was placed in a police car) *with U.S. v. Greer*, 607 F.3d 559, 564 (8th Cir. 2010) (finding intervening circumstances existed between an unlawful entry and the defendant's consent to search where the defendant's brother arrived after the unlawful entry, the defendant

be brought to the police station. Det. Pfaff immediately encountered Defendant upon Defendant's handcuffed entrance into the station under police escort and Defendant continued to remain in custody prior to giving consent. Furthermore, although Det. Pfaff testified that his "primary goal" in questioning Defendant (without *Miranda* warnings) was to obtain the Defendant's cooperation in separate investigations, obtaining Defendant's consent to search went beyond that primary goal.

Because Defendant's consent to search his apartment, his vehicle, and Ms. Rivera's apartment is not sufficiently attenuated from the unlawful stop and seizure, Defendant's consent was tainted and the evidence derived from those searches must be suppressed as fruit of the poisonous tree.[107]

## Conclusion

The State has not met its burden of proving that the police acted in accordance with constitutional protections. The arresting officers lacked probable cause to believe that Defendant had committed a traffic code violation. Moreover, even if the stop was valid, Defendant's detention was unreasonably extended beyond that necessary to effectuate a traffic stop and the police lacked probable

---

consulted with his brother as to whether to give consent, and he signed a consent form despite his brother's suggestion that he contact a lawyer).

[107] *Lopez-Vazquez v. State*, 955 A.2d at 1293. *See also Roy v. State*, 62 A.3d at 1189 (finding "incriminating evidence derived from illegal police conduct – termed the 'fruit of the poisonous tree' – must . . . be excluded") (citing *Wong Sun v. U.S.*, 371 U.S. at 488).

cause to arrest him without a warrant pursuant to 21 *Del. C.* § 701. Additionally, because the CI's tip lacked specificity as to alleged illegal activity, the police did not have reasonable articulable suspicion to stop and seize Defendant or probable cause to make a felony arrest pursuant to 11 *Del. C.* § 1904(b). Based on the foregoing, the stop and seizure occurred in violation of Defendant's rights under Fourth Amendment and Article I, § 6.

Furthermore, because Defendant's consent to search is not sufficiently attenuated from the unlawful stop and seizure, the evidence that was derived from his consent may not be introduced at trial to prove Defendant's guilt and, therefore, is suppressed.

Accordingly, Defendant's Motion to Suppress is GRANTED.

**IT IS SO ORDERED.**

                                                _____

                                                Judge Diane Clarke Streett

oc:    Prothonotary

cc:    Dep. Atty. Gen. Sarita R. Wright
         Patrick Collins, Esquire